JENNER & BLOCK LLP
Brent Caslin (SBN 198682)
bcaslin@jenner.com
David R. Singer (SBN 204699)
dsinger@jenner.com
Elizabeth Baldridge (SBN 313390)
ebaldridge@jenner.com
Carolyn S. Small (SBN 304938)
csmall@jenner.com
515 South Flower Street, Suite 3300
Los Angeles, CA  90071-2246
Telephone:  +1 213 239 5100
Facsimile:   +1 213 239 5199

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| MOVE, INC., a Delaware corporation; MOVE SALES, INC., a Delaware corporation; REALSELECT, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>COSTAR GROUP, INC., a Delaware corporation; JAMES KAMINSKY, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:24-cv-05607-GW-BFM<br><br>**PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>District Judge: George H. Wu<br><br>Date: September 23, 2024<br>Time: 8:30 a.m.<br>Courtroom: 9D<br><br>Filed concurrently herewith:<br>(1) Declarations of Elizabeth Baldridge, Andy Crain, Carl Gruenberg, Alexandra Holbert, Kat Koutsantonis, Amy Maas, Mickey Neuberger, Howard Pence, and Max Zimbert, and accompanying exhibits<br>(2) Application to Seal<br>(3) [Proposed] Order<br><br>FAC Filed: August 16, 2024<br>Trial Date: None Set |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on September 23, 2024, at 8:30 a.m., or as soon thereafter as counsel may be heard, before the Honorable George H. Wu, in Courtroom 9D of the United States District Court for the Central District of California, located at 350 West 1st Street, Los Angeles, California 90012, Plaintiffs Move, Inc., Move Sales, Inc., and RealSelect, Inc. (collectively, "Move") will and hereby do move the Court for an order entering a Preliminary Injunction restraining and enjoining Defendants CoStar Group, Inc. and James Kaminsky from any further unauthorized access of the following Move-owned files, and from any use or disclosure of Move's confidential and trade secret information contained in the following:

a.    the "N&I Audience and Revenue for PMDLT" document, attached as Exhibit A to the Declaration of Max Zimbert;

b.    the "Comms + Econ + N&I Project Call" file, excerpts of which are attached as Exhibit A to the Declaration of Alexandra Holbert;

c.    the "N&I_News Corp Partnerships and Amplifications for Growth" file, attached as Exhibit A to the Declaration of Mickey Neuberger;

d.    the "Editorial Budget" file, excerpts of which are attached as Exhibit B to the Declaration of Alexandra Holbert; and

e.    the employment summaries of several individuals at Move, including job titles, descriptions, and compensation, that Mr. Kaminsky sent to a personal Gmail account on January 12, 2024, attached as Exhibit A to the Declaration of Carl Gruenberg.

This Motion amends the preliminary injunction motion filed by Move on July 15, 2024. It is filed pursuant to the briefing schedule agreed upon by the parties and ordered by the Court. ECF No. 52. The Motion is based upon this Amended Notice of Motion and Motion; the attached Memorandum of Points and Authorities; the Declarations of Elizabeth Baldridge, Andy Crain, Carl Gruenberg, Alexandra

Holbert, Kat Koutsantonis, Amy Maas, Mickey Neuberger, Howard Pence, and Max Zimbert and exhibits thereto; all documents on file in this action; and such further or additional evidence or argument as may be presented before or at the time of the hearing on this Motion.  Plaintiffs are also concurrently filing an application to seal portions of the supporting declarations and exhibits.

Dated:  August 27, 2024                    JENNER & BLOCK LLP

                                                By: _____
                                                      Brent Caslin
                                                      David R. Singer
                                                      Elizabeth Baldridge
                                                      Carolyn S. Small

                                                *Attorneys for Plaintiffs*

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ....................................................................................................1

II.   FACTUAL BACKGROUND.................................................................................2

    A.    Move's Realtor.com Business and Its Successful Content Strategy..........................................................................................................2

    B.    CoStar's Homes.com Business and Its Competition with Realtor.com for Website Traffic. ...............................................................3

    C.    Move's Trade Secret Information and Files.............................................3

        1.    Audience and Revenue Strategy. ...................................................4

        2.    The Business Plan. .........................................................................5

        3.    Growth Plan. ..................................................................................5

        4.    The Editorial Budget. ....................................................................5

        5.    Employee Information. ...................................................................6

    D.    Move's Efforts to Protect Its Confidential Files and Trade Secrets.......................................................................................................6

    E.    Kaminsky's Evasion of Move's Security Measures and Misappropriation of the Trade Secret Documents. ...............................7

    F.    CoStar's Response Blaming the Victim, Boasting It Has No Plan to Act Responsibly, and Effectively Ratifying Mr. Kaminsky's Wrongdoing. ...............................................................9

III.  ARGUMENT........................................................................................................10

    A.    The Court Should Preliminarily Enjoin CoStar and CoStar Employee James Kaminsky. ...............................................................10

        1.    Move Will Succeed on the Merits of Its Claims......................11

            a.    Move Will Prevail on its Trade Secret Claims..............11

                i.    Move Owns Trade Secrets. ...................................11

                ii.    Defendants Misappropriated Move's Trade Secrets. ........................................................13

                iii.    Damages or Threatened Damages.........................16

            b.    Move Will Prevail on its CFAA Claim. .........................17

            c.    Move Will Prevail on its Contract Claim. ......................18

           2.    Move Will Suffer Further Irreparable Harm Without a Preliminary Injunction. ..............................................................19

i

3.    The Balance of Hardships Tips Sharply in Move's
Favor. ...................................................................................20

4.    An Injunction Against Defendants Is in the Public
Interest.................................................................................21

B.    Any Required Security Should Be Waived or Minimal. ....................21

IV.    CONCLUSION.............................................................................................22

PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpha Capital, LLC v. Khanukov,*
  2023 WL 4721109 (S.D. Cal. July 21, 2023) ....................................................11

*Beluca Ventures LLC v. Einride Aktiebolag,*
  660 F. Supp. 3d 898 (N.D. Cal. 2003) ...........................................................11, 12

*Brocade Comms. Sys., Inc. v. A10 Networks, Inc.,*
  873 F. Supp. 2d 1192 (N.D. Cal. 2012) ..............................................................16

*Calendar Research LLC v. StubHub, Inc.,*
  2017 WL 10378336 (C.D. Cal. Aug. 16, 2017) ..................................................18

*Chartwell Staffing Servs Inc. v. Atlantic Solutions Grp. Inc.,*
  2019 WL 2177262 (C.D. Cal. May 20, 2019) ................................................11, 12

*Cisco Systems, Inc. v. Chung,*
  462 F. Supp. 3d 1024 (N.D. Cal. 2020) ...........................................11, 14, 15, 16

*Cutera, Inc. v. Lutronic Aesthetics, Inc.,*
  444 F. Supp. 3d 1198 (E.D. Cal. 2020) ...............................................................11

*Domain Name Comm'n Ltd. v. DomainTools, LLC,*
  781 F. App'x 604 (9th Cir. 2019) .......................................................................10

*Edwards Lifesciences Corp. v. Launey,*
  2023 WL 4680774 (C.D. Cal. June 12, 2023) .................................13, 14, 15, 20

*Extreme Reach, Inc. v. Spotgenie Partners, LLC,*
  2013 WL 12081182 (Nov. 22, 2013) .............................................................17, 22

*First Foundation Inc. v. Giddings,*
  2020 WL 1082641 (C.D. Cal. Mar. 7, 2020) ................................................16, 17

*Galderma Labs., L.P. v. Revance Therapeutics, Inc.,*
  2024 WL 3008860 (C.D. Cal. Mar. 29, 2024) ....................................................14

*Greeburg v. Wray,*
  2022 WL 2176499 (D. Ariz. June 16, 2022) .......................................................18

iii

*Henry Schein, Inc. v. Cook*,
  191 F. Supp. 3d 1072 (N.D. Cal. 2016)....................................................19, 20, 21

*Hollingsworth Solderless Terminal Co. v. Turley*,
  622 F.2d 1324 (9th Cir. 1980) .........................................................................11, 12

*Language Line Servs., Inc. v. Language Servs. Associates, Inc.*,
  944 F. Supp. 2d 775 (N.D. Cal. 2013) ..................................................................14

*LVRC Holdings LLC v. Brekka*,
  581 F.3d 1127 (9th Cir. 2009) .........................................................................17, 18

*MAI Systems Corp. v. Peak Computer, Inc.*,
  991 F.2d 511 (9th Cir. 1993) ................................................................................11

*Manitowoc Cranes LLC v. Sany America Inc.*,
  2017 WL 6327551 (E.D. Wis. Dec. 11, 2017) ......................................................14

*Morlife, Inc. v. Perry*,
  56 Cal. App. 4th 1514 (1997) ...............................................................................13

*Pyro Spectaculars N., Inc. v. Souza*,
  861 F. Supp. 2d 1079 (E.D. Cal. 2012) ................................................................21

*Richman v. Hartley*,
  224 Cal. App. 4th 1182 (2014) .............................................................................19

*SolarCity Corp. v. Pure Solar Co.*,
  2016 WL 11019989 (N.D. Cal. Dec. 27, 2016)................................................14, 18

*WeRide Corp. v. Kun Huang*,
  379 F. Supp. 3d 834 (N.D. Cal. 2019) ......................................................16, 19, 20

*Whyte v. Schlage Lock Co.*,
  101 Cal. App. 4th 1443 (2002) .............................................................................11

*Winter v. Natural Res. Defense Council, Inc.*,
  555 U.S. 7 (2008).............................................................................................10, 21

**Statutes**

18 U.S.C. § 1030(a)(4)..............................................................................................17

18 U.S.C. § 1836(b)(3)(A).........................................................................................10

18 U.S.C. § 1839(3) ..................................................................................................11

PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION

18 U.S.C. § 1839(3)(A)...........................................................................................11

18 U.S.C. § 1839(5)...............................................................................................15

18 U.S.C. § 1839(5)(A)..........................................................................................13

18 U.S.C. § 1839(5)(B)..........................................................................................13

18 U.S.C. § 1839(6)(A)..........................................................................................13

Cal. Civ. Code § 3426.1(a) ...................................................................................13

Cal. Civ. Code § 3426.1(b) ...................................................................................15

Cal. Civ. Code § 3426.1(b)(1) ..............................................................................13

Cal. Civ. Code § 3426.1(b)(2) ..............................................................................13

Cal. Civ. Code § 3426.1(d) ...................................................................................11

Cal. Civ. Code § 3426.1(d)(2) ..............................................................................11

Cal. Civ. Code § 3426.2(a) ...................................................................................10

Cal. Penal Code § 502(e)(1)..................................................................................10

**Court Rules**

Fed. R. Civ. P. 65(c)..............................................................................................22

PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

During his final days at Move Sales, Inc. (together with Move, Inc. and RealSelect, Inc., "Move"), James Kaminsky sent confidential Move files from his work email to his Gmail account and used his Move credentials to grant that same personal account access to other files.  Mr. Kaminsky tried to cover his tracks, deleting more than 900 files and clearing the browser history from his Move laptop. He then surreptitiously accessed Move's electronic files, acquiring Move's trade secrets, including repeatedly while working for his new employer—and Move's competitor—CoStar Group, Inc. ("CoStar").

A preliminary injunction prohibiting Mr. Kaminsky and CoStar (collectively, "Defendants") from further misappropriation is necessary to preserve the status quo between now and trial because Defendants cannot be trusted to police themselves. One might expect that, after Mr. Kaminsky's cyber intrusion came to light, CoStar would admonish its employee and take immediate action to prevent further wrongdoing.  But that did not happen.  Instead, CoStar ratified the misconduct by rushing to Mr. Kaminsky's defense and attacking Move.  CoStar's General Counsel treated its employee's conduct as acceptable behavior, calling this lawsuit a "pimple on the elephant of [his] litigation (duties)," and stating, "***it's not even something I'm going to think about***."    Similarly, without any criticism of its employee's misconduct, CoStar's CEO stated that Mr. Kaminsky—the CoStar employee who accessed a competitor's computer system, destroyed evidence, and misappropriated confidential information—is the victim.  He called Move's attempts to seek a remedy in this Court "laughable."  Indeed, even after Mr. Kaminsky admitted that he repeatedly accessed Move's confidential files without authorization, including while working for CoStar, CoStar's CEO insisted Mr. Kaminsky "didn't do anything wrong."  It could not be clearer court intervention is needed to rein in CoStar.

Although the scope of wrongdoing by CoStar and its employee is broad—with dozens of access events into Move's trade secrets and nearly a thousand deleted files—the requested preliminary injunction is narrow.  It would not prevent Mr. Kaminsky from working or CoStar from constructing a competing product.  It seeks only to stop further misappropriation of specific trade secrets.

## II.    FACTUAL BACKGROUND

### A.    Move's Realtor.com Business and Its Successful Content Strategy.

Move operates the online real estate listings service Realtor.com.  Declaration of Alexandra Holbert ("Holbert Decl.") ¶ 2; Declaration of Amy Maas ("Maas Decl.") ¶ 2.  Like other online real estate listings businesses, Realtor.com makes money by, among other things, providing real estate agents with prime placements for their listings.  Declaration of Mickey Neuberger ("Neuberger Decl.") ¶ 6.  By attracting homebuyers to Realtor.com, Move generates leads for agents, which Move is able to monetize.  *Id.*  That is why website traffic, and so-called "unique users," are the lifeblood of the online real estate listing business.  *Id.*

One of Move's strategies to drive website traffic is creating, curating, and optimizing content for Realtor.com, including insights about the properties, economics, trends, and other information that attracts visitors.  *Id.* ¶ 7.  Move has differentiated itself from competitors and attracted unique users through the publication of high-quality content, in particular at the News & Insights section of Realtor.com.  Maas Decl. ¶¶ 3-4.

The success of Move's content strategy has been hard-won.  The team at Move has spent years investing in and devising a winning formula for optimizing its website content so that search engines have a higher likelihood of suggesting Realtor.com to users.  Neuberger Decl. ¶7.  This is called search engine optimization, sometimes known as "SEO," and it provides Move with a substantial competitive advantage over CoStar, which has struggled to leverage search engine optimization for its competing website at Homes.com.  *Id.*

Mr. Kaminsky was a content creator at Realtor.com and led the News & Insights team. Declaration of Elizabeth Baldridge ("Baldridge Decl.") Ex. A at 2; Holbert Decl. ¶ 5. He understood the importance of content, referring to News & Insights as Move's "monetization engine." *See* Baldridge Decl. Ex. A at 2. Indeed, Mr. Kaminsky helped prepare a presentation highlighting that News & Insights' content "attracts new users to Realtor.com and provides added value to existing users." Declaration of Max Zimbert ("Zimbert Decl.") ¶ 5, Ex. A at 5. Move's confidential strategy for creating content and increasing search engine optimization gives it a competitive edge because it allows Move to drive traffic to its site for free, while other competitors have to pay for traffic. Neuberger Decl. ¶ 8.

## B. CoStar's Homes.com Business and Its Competition with Realtor.com for Website Traffic.

CoStar does not have a robust News-&-Insights-type product that drives traffic to Homes.com. It recently launched a campaign to increase traffic to Homes.com, spending an eye-popping $1 billion on marketing. Baldridge Decl. Ex. D. CoStar has also invested hundreds of millions of dollars to grow its content offering on Homes.com to attract more users. *Id.* Ex. M at 3.

Realtor.com and Homes.com are in a well-publicized battle for website traffic. Baldridge Decl. Ex. N. Despite CoStar's huge investment to grow traffic numbers for Homes.com, it consistently ranks behind Move in unique users. Neuberger Decl. ¶ 9. CoStar is intensely focused on overtaking Realtor.com in this competition. *Id.*

## C. Move's Trade Secret Information and Files.

Move's News & Insights, Communications, and Economics teams maintain confidential electronic files at the heart of Move's strategy and operations. Holbert Decl. ¶¶ 6-7, 9; Maas Decl. ¶ 7; Neuberger Decl. ¶¶ 12-14. Move personnel store these files on a confidential and protected Google Docs service. Maas Decl. ¶¶ 6, 8; Zimbert Decl. ¶ 5; Holbert Decl. ¶¶ 6, 11.

There are five confidential files containing trade secrets at issue in this motion

3

(collectively, the "Trade Secret Documents"): **(1)** "N&I Audience and Revenue for PMDLT" (the "Audience and Revenue Strategy"); **(2)** "Comms + Econ + N&I Project Call" (the "Business Plan"); **(3)** "N&I/News Corp Partnerships and Amplifications for Growth" (the "Growth Plan"); **(4)** "JAN 2023 – 2024 EDITORIAL BUDGET" (the "Editorial Budget"), excerpts of which are attached as Exhibit B to the Holbert Declaration; and **(5)** employment summaries of several individuals at Move (the "Employee Information").[1]  Each file is discussed below.

### 1. Audience and Revenue Strategy.

The Audience and Revenue Strategy is a document that assesses and analyzes the impact of certain types of website content on user engagement and traffic growth. *See* Zimbert Decl. Ex. A.  The document explains the different categories of content Move publishes on its site and the carefully calibrated mix of categories that Move uses to maximize traffic and engage users. *Id.* at 4.  It also contains confidential information about how Move syndicates content to engage and attract users to Realtor.com; discusses Move's strategies for search engine optimization, including its return on investment; and contains data about its effectiveness at attracting visitors who become potential leads for real estate professionals. *See, e.g.*, *id.* at 11-12, 14; *see also* Neuberger Decl. ¶¶ 7-8.  This information would be a treasure trove of competitive intelligence to any company in the online residential real estate listings business, which could use the information to adjust or improve its own advertising spend and search engine optimization tactics to benefit from Move's strategy and tactics.  Neuberger Decl. ¶¶ 7-8, 13-14.

Mr. Kaminsky downloaded the Audience and Revenue Strategy after leaving Move and accessed it multiple times while employed at CoStar.  Pence Decl. Ex. B at 1-3.

---

[1] The Audience and Revenue Strategy is attached as Exhibit A to the Zimbert Declaration; excerpts of the Business Plan are attached as Exhibit A to the Holbert Declaration; the Growth Plan is attached as Exhibit A to the Neuberger Declaration; and the Employee Information is attached as Exhibit A to the declaration of Carl Gruenberg ("Gruenberg Decl.").

4

## 2. The Business Plan.

The Business Plan is a living document that sets forth a detailed business plan for the entire News & Insights, Communications, and Economics strategy of Realtor.com. Holbert Decl. ¶¶ 6-7. It contains, among other things, traffic data for each of Realtor.com's top-performing stories, including page views and the sources of that traffic; details on why certain metrics are up or down in a particular week; social media research; lists of reporter contacts; and plans for ongoing projects. *Id.* ¶ 7. The Business Plan is updated weekly by Move personnel and contains nearly four years of confidential information. *Id.*

The Business Plan is the file Mr. Kaminsky was spying on the day he was caught accessing Move's trade secrets while working for CoStar. *See* Maas Decl. Ex. A.

## 3. Growth Plan.

The Growth Plan explains how News & Insights differentiates Realtor.com from competitors and attracts new users to the site, and it sets forth a strategy for user growth. *See generally* Neuberger Decl. Ex. A. It contains tactics for editorial syndication and amplification, *id.* at 10-18; an exact breakdown by subject matter of Move's "calibrated mix" of content designed to improve search engine optimization, *id.* at 6-7; specific strategies to increase the percentage of News & Insights website traffic that converts into revenue-generating sections of the site, *id.* at 23; and confidential page-view information that shows which content types resonated most with Realtor.com visitors, *id.* at 8.

Mr. Kaminsky repeatedly accessed and viewed the Growth Plan after leaving Move and starting a job at CoStar. *See* Pence Decl. Ex. B at 1-3.

## 4. The Editorial Budget.

Like the Business Plan, the Editorial Budget is a living, regularly updated electronic file. Holbert Decl. ¶ 9. It provides hour-by-hour information about content on Realtor.com and contains reporter contact information and summaries of

5

their beats and subject-matter interests. *Id.* Ex. B at 37-39. It outlines the experience and business methods used to develop content and is a real-time roadmap for Move's strategic timing and content planning. *See generally id*. Ex. B.

The Editorial Budget was one of several files to which Mr. Kaminsky granted his personal email address access as he was preparing to end his employment at Move and viewed after he left. Pence. Decl. Exs. A at 1, B at 1.

### 5. Employee Information.

The Employee Information documents are profiles for several Move employees involved in content creation, including information about job titles, job descriptions, and compensation. Gruenberg Decl. Ex. A. The Employee Information—which Mr. Kaminsky emailed to his personal email address on his last day as a Move employee—would be useful to any effort to recruit Move's content creators. *See id.*

Taken together, the Trade Secret Documents contain all the financial analyses, internal data and metrics, operational work, future plans, and employee information a competitor would need to steal some or all of the content strategy at the core of Move's content business model. Holbert Decl. ¶ 14; Maas Decl. ¶ 8; Zimbert Decl. ¶ 8; Neuberger Decl. ¶ 12-14. The information is immensely valuable to a company, like CoStar, that is focused on developing content to drive users to its website. *See* Neuberger Decl. ¶ 8, 12-14.

### D.    **Move's Efforts to Protect Its Confidential Files and Trade Secrets.**

The Audience and Revenue Strategy, Business Plan, Growth Plan, and Editorial Budget documents are stored on the confidential and protected Google Docs service Move uses; the Employee Information is stored on a password-protected private database system. Maas Decl. ¶¶ 6, 8; Zimbert Decl. ¶ 7; Holbert Decl. ¶¶ 6, 11; Neuberger Decl. ¶ 12; Gruenberg Decl. ¶ 5. Move employees must sign confidentiality agreements, and departing employees are required to confirm confidentiality promises. Declaration of Kat Koutsantonis ("Koutsantonis Decl.")

¶ 9; *see also* Holbert Decl. ¶ 13; Neuberger Decl. ¶ 4; Maas Decl. ¶ 5.  Move also has electronic security measures in place, including password requirements for network access, multifactor authentication, security software and firewalls, laptop encryption, and employee cybersecurity and confidentiality training. Pence Decl. ¶¶ 3-10; Koutsantonis Decl. ¶ 9; Neuberger Decl. ¶ 4; Holbert Decl. ¶ 13.

**E.**    **Kaminsky's Evasion of Move's Security Measures and Misappropriation of the Trade Secret Documents.**

As a Move employee, Mr. Kaminsky signed an "Employee Invention Assignment and Confidentiality Agreement" (the "Confidentiality Agreement") acknowledging he would have access to confidential and trade secret information while at Move and agreeing to hold this information in "strict confidence and trust" and not "use or disclose it" outside Move.   Koutsantonis Decl. ¶ 3, Ex. A at 3. Mr. Kaminsky also promised that, upon termination of his employment, he would "not take with [him] any documents or materials or copies thereof" containing confidential or trade secret information.  *Id.*  He agreed that in the event of a breach, Move could "suffer irreparable harm" and would be entitled to injunctive relief.  *Id.* at 5.

Mr. Kaminsky, through his Move email credentials, enjoyed access to Move's email system and cloud-based electronic storage system hosted by Google Docs. Declaration of Howard Pence ("Pence Decl.") ¶ 11.  He was also assigned a laptop. *Id.* ¶ 12.  Every time he turned on his laptop, Mr. Kaminsky would have seen a conspicuous "NOTICE TO USERS" reminding him of the prohibitions against unauthorized or improper use of Move's systems.  Neuberger Decl. ¶ 4.

On January 10, 2024, Move notified Mr. Kaminsky his employment would terminate on January 19, and his last working day would be January 12. Koutsantonis Decl. ¶ 5.  In response, Mr. Kaminsky acted quickly to access Move's confidential files, adding his personal Gmail account as an authorized viewer or editor for dozens of files stored on Move's Google Docs service.  Pence Decl. Ex. A.

Mr. Kaminsky sent the Employee Information to his Gmail.  Gruenberg Decl. Ex. A.

On January 25, 2024, Mr. Kaminsky signed a separation agreement (the "Separation Agreement").  *Id.* Ex. B.  Under its terms, Move agreed to pay Mr. Kaminsky a substantial severance payment and other benefits.  *Id.* at 1.  In exchange, Mr. Kaminsky "represent[ed] and warrant[ed]" he had returned to Move, or would return as soon as reasonably practicable, "all tangible or intangible property or data" belonging to Move, "of any type whatsoever[.]"  *Id.* at 2.  He promised he would "continue to be bound by the terms of the Confidentiality Agreement," hold all confidential and trade secret information "in the strictest confidence," and not use it "on behalf of anyone."  *Id.*  Mr. Kaminsky confirmed he had "delivered to [Move] all documents and data of any nature" containing or pertaining to confidential or trade secret information, and he had "not retained any such documents or data or any reproduction thereof."  *Id.*

On February 19, 2024, Mr. Kaminsky deleted nearly a thousand electronic files and his entire web browsing history from his Move laptop before shipping it back to Move.  Declaration of Andy Crain ("Crain Decl.") ¶¶ 11-12.  Notably, the Audience and Revenue Strategy file that Mr. Kaminsky downloaded shortly after he left Move was not among the documents deleted from his Move laptop, meaning he likely downloaded the document to a different computer.  *Id.* ¶ 18.

In March 2024, Mr. Kaminsky started at CoStar.  Baldridge Decl. Ex. A at 1.  There have been inconsistent statements from Defendants about Mr. Kaminsky's role there.  *Compare id.* Ex. F at 3 (CoStar's CEO calling Mr. Kaminsky a "relatively junior employee" who writes descriptions of condominium buildings), *with id.* Ex. A at 1 (Mr. Kaminsky holding himself out on LinkedIn as a "Senior Editorial Director, "Team Leader," Brand Builder," and "Content Strategist"), *with id.* Ex. O at 3 (CoStar's General Counsel acknowledging that Mr. Kaminsky is at least a "mid-level manager").  Whatever his precise role—junior, middle management, or senior—there is no doubt CoStar is investing enormous amounts

8

into content for Homes.com, Mr. Kaminsky is part of that content effort, and the misappropriated trade secrets relate to Move's successful content strategy. *Id.* Ex. A at 1.

Mr. Kaminsky's surreptitious access to Move's confidential materials continued after he began working for CoStar. Pence Decl. Ex. B. Indeed, Mr. Kaminsky used his secret entry point to access Move's files more than ***30 times*** after becoming a CoStar employee. *Id.* As noted above, this included repeatedly accessing the Audience and Revenue Strategy, Business Plan, and Growth Plan files described in Section II.C, *supra*. Pence Decl. Ex. B. Mr. Kaminsky continued accessing files on June 2, 2024. *Id.* He returned on June 3, 2024 to access the Business Plan. Maas Decl. ¶ 9, Ex. A. The fact that Mr. Kaminsky continued accessing the Business Plan—a living file he knew was regularly updated—evidences he was keeping tabs on the latest operations at Move. *See, e.g.*, Holbert Decl. ¶¶ 6, 9.

After Mr. Kaminsky's security breach was discovered, on June 9, 2024, he again tried to access a protected Move file. Pence Decl. ¶ 14, Ex. B.

Mr. Kaminsky admits that, on January 11 and 12, 2024, he used his Move email address to grant his personal email address access to Move's internal documents. ECF No. 34-1 (Kaminsky Decl.) ¶ 18. He also admits he emailed himself the Employee Information, *id.* ¶ 21, and accessed and viewed Move documents after he left Move, including after he began working for CoStar's content creation team, *see, e.g.*, *id.* ¶¶ 24-27, 40, 42.

## F. <u>CoStar's Response Blaming the Victim, Boasting It Has No Plan to Act Responsibly, and Effectively Ratifying Mr. Kaminsky's Wrongdoing.</u>

After Mr. Kaminsky's misappropriation was exposed, CoStar did not admonish its employee for his misconduct. Instead, it came to Mr. Kaminsky's defense, seeking to normalize trade secret misappropriation. CoStar's General

Counsel stated this lawsuit is "like the pimple on the elephant of my litigation (duties)," and "it's not even something I'm going to think about." Baldridge Decl. Ex. F at 1. The CEO of CoStar labeled Move's request for a civil remedy in this Court "laughable." *Id.* Ex. G at 1. After being presented with evidence and admissions that Mr. Kaminsky illegally accessed Move's protected computer systems while employed by CoStar, destroyed evidence, and stole information from a competitor—also a violation of CoStar's own policies, ECF No. 21 at 6—CoStar's CEO effectively ratified Mr. Kaminsky's conduct by publicly announcing he "didn't do anything wrong." Baldridge Decl. Ex. L at 20:51-54. CoStar's message, from the top of the company to every CoStar employee, is that stealing a competitor's trade secrets, breaching confidentiality agreements, deleting evidence, and violating CoStar's own policies is acceptable and will result in strong support from company leadership. *See id.*

### III.  ARGUMENT

### A.  The Court Should Preliminarily Enjoin CoStar and CoStar Employee James Kaminsky.

The Defend Trade Secrets Act ("DTSA") and California's Uniform Trade Secrets Act ("CUTSA") authorize injunctive relief, *see* 18 U.S.C. § 1836(b)(3)(A); Cal. Civ. Code § 3426.2(a), as does the Computer Fraud and Abuse Act ("CFAA"), Cal. Penal Code § 502(e)(1). Additionally, the Ninth Circuit has authorized the issuance of preliminary injunctions to stop a continuing breach of contract. *Domain Name Comm'n Ltd. v. DomainTools, LLC*, 781 F. App'x 604, 607 (9th Cir. 2019).

To obtain a preliminary injunction, Move must show (1) likelihood of success on the merits, (2) likelihood of irreparable harm, (3) that the "balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Each requirement is met here.

**1. Move Will Succeed on the Merits of Its Claims.**

**a.  Move Will Prevail on its Trade Secret Claims.**

The federal and state trade secret statutes have "substantially similar elements." *Alpha Capital, LLC v. Khanukov*, 2023 WL 4721109, at *3 (S.D. Cal. July 21, 2023).  Under those statutes, Move must establish that (1) Move owned a trade secret, (2) Defendants misappropriated the trade secret, and (3) Defendants' misappropriation damaged Move.  *See, e.g.*, *Cisco Systems, Inc. v. Chung*, 462 F. Supp. 3d 1024, 1046 (N.D. Cal. 2020).  Each element is satisfied.

*i.    Move Owns Trade Secrets.*

State and federal trade secret statutes define "trade secrets" broadly to include *any information*, maintained in confidence, that derives "independent economic value, actual or potential," from not being generally known or available to others who could obtain economic value from its use or disclosure.  18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1(d).  To be a trade secret, the owner of the information must have taken "reasonable" measures to keep such information secret.  18 U.S.C. § 1839(3)(A); Cal. Civ. Code § 3426.1(d)(2).  In determining whether information is a trade secret, a primary consideration is "whether the information is readily accessible to a reasonably diligent competitor." *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1332 (9th Cir. 1980).

"Marketing strategy and plans (including [a company's] five-year strategic plan)" constitute trade secrets. *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1456 (2002) *see also Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 908-909 (N.D. Cal. 2003) (information about business strategies and the features of its technology that gave the plaintiff "a competitive advantage" was trade secret information).  Customer lists and information that accompanies the list, like key contacts, are also trade secrets. *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993); *Chartwell Staffing Servs Inc. v. Atlantic Solutions Grp. Inc.*, 2019 WL 2177262, at *6 (C.D. Cal. May 20, 2019).

Like the customer database in *Chartwell* and the business information in *Beluca*, the Trade Secrets Documents contain non-public information that provides Move with a "competitive advantage." *See Chartwell*, 2019 WL 2177262, at *7; *Beluca*, 660 F. Supp. 3d at 909. As described above, the Trade Secret Documents include detailed financial analyses and operational information, internal site traffic metrics, publication schedules, and information about what content is popular with consumers. Holbert Decl. ¶¶ 6-10; Maas Decl. ¶¶ 7-8; Neuberger Decl. ¶¶ 12-14; Zimbert Decl. ¶¶ 5-6. The Audience and Revenue Strategy, for instance, discusses Move's strategies and tactics for search engine optimization, including its return on investment, and the Growth Plan describes specific strategies to increase the percentage of News & Insights website traffic that converts into revenue-generating sections of the site. *See, e.g.*, Zimbert Decl. Ex. A 11-12, 14; Neuberger Decl. ¶¶ 12-14, Ex. A at 8, 23. The Editorial Budget is also also analogous to the customer database in *Chartwell* because it contains lists of the reporter contacts gathered over the years, beats and interests, and ongoing projects. Holbert Decl. Exs. A-B; Gruenberg Decl. Ex. A. All this information has been gathered, distilled, and compiled at costly effort over time. Holbert Decl. ¶ 7; Maas Decl. ¶ 14; Neuberger Decl. ¶ 13. It is far from "readily accessible to a reasonably diligent competitor." *See Hollingsworth*, 622 F.2d at 1332.

Moreover, the information in the Trade Secret Documents derive independent economic value from not being known to competitors. Although the definition of "trade secrets" covers more than secret formulas, the documents here in fact contain Move's successful (and, until now, confidential) formula for search engine optimization—a distinct competitive advantage Move enjoys. Neuberger Decl. ¶ 14. Its competitors could use the information in those documents to craft, adjust, or improve their own content plans, advertising spend, and search-engine-optimization tactics to benefit from Move's knowledge. *See* Neuberger Decl. ¶¶ 7-8, 13-14. The Employee Information would be useful to recruit content creators from Move.

Gruenberg Decl. Ex. A. It would be severely detrimental for any of Move's competitors to have access to the information in the Trade Secret Documents. *See, e.g.*, Neuberger Decl. ¶¶ 8, 14 (describing how the strategies set forth in the Trade Secret Documents would allow CoStar to increase search engine optimization and save millions in advertising spend); *see also* Holbert Decl. ¶ 14; Maas Decl. ¶ 8; Zimbert Decl. ¶ 8.

Additionally, Move plainly "intended [the information in the Trade Secrets Documents] to remain secret and undertook steps to secure that end." *See Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1523 (1997); *supra* Section II.D (describing Move's efforts to protect its confidential files and trade secrets).

### ii.    *Defendants Misappropriated Move's Trade Secrets.*

"Misappropriation" includes (1) the "***acquisition*** of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"; or (2) "[d]isclosure or use of a trade secret of another without express or implied consent[.]" 18 U.S.C. § 1839(5)(A)-(B); Cal. Civ. Code § 3426.1(b)(1)-(2) (emphases added). "Improper means" includes, among other things, "espionage through electronic or other means." 18 U.S.C. § 1839(6)(A); Cal. Civ. Code § 3426.1(a). Because merely ***acquiring*** trade secrets by inappropriate means "***in and of itself constitutes misappropriation***," Move need not show that Mr. Kaminsky disclosed or used the Trade Secret Documents to establish misappropriation. *See Edwards Lifesciences Corp. v. Launey*, 2023 WL 4680774, at *4 (C.D. Cal. June 12, 2023) (emphases added).

An employer is vicariously liable for its employee's misappropriation when the act of misappropriation is within the scope of employment. *See*, *e.g.*, *Language Line Servs., Inc. v. Language Servs. Associates, Inc.*, 944 F. Supp. 2d 775, 778, 783 (N.D. Cal. 2013); *Manitowoc Cranes LLC v. Sany America Inc.*, 2017 WL 6327551, *5 (E.D. Wis. Dec. 11, 2017) (noting district courts have applied the doctrine of *respondeat superior* under their versions of CUTSA). Misappropriation is "within

the scope of employment when it is performed, at least in part, to benefit the employer, though the employer may forbid it." *SolarCity Corp. v. Pure Solar Co.*, 2016 WL 11019989, at \*5 (N.D. Cal. Dec. 27, 2016); *see also Galderma Labs., L.P. v. Revance Therapeutics, Inc.*, 2024 WL 3008860, at \*4 (C.D. Cal. Mar. 29, 2024) (same). In *SolarCity*, for example, the plaintiff's former employee was alleged to have stolen his employer's customer lists and taken them to a competitor. 2016 WL 11019989, at \*1-2. The reason for the theft was to "gain additional customer sales leads for [the defendant]," and thus it was immaterial that the defendant "would have forbid his conduct had it been aware of his actions." 2016 WL 11019989 at \*5; *see also Cisco*, 462 F. Supp. 3d at 1034 (reasonable to infer a defendant-employee misappropriated trade-secret information to benefit his employer when the employer and the plaintiff "operate[d] in the same industry").

Here, Mr. Kaminsky, at minimum, acquired trade secrets by improper means when he accessed confidential Move files. *See Edwards*, 2023 WL 4680774, at \*3 (finding that the defendant acquired the plaintiffs' trade secrets by improper means when he "transmitted via email hundreds of confidential documents to himself just one day before leaving Edwards to work at another company"). Mr. Kaminsky admits that, while employed by CoStar, he accessed and even *read* Move's trade secret materials, but he claims his use of Move's materials should be excused because he was merely satisfying his curiosity. Kaminsky Decl. ¶ 40. Given Mr. Kaminsky's repeated access to the files over the course of several months, and the fact that the files relate to Move's successful content creation while Mr. Kaminsky was creating content for Move's competitor in the same business, the explanation is not remotely credible. Even if credited, however, it remains undisputed that Mr. Kaminsky, while at CoStar, unlawfully accessed Move's trade secrets. He, while at CoStar, acquired them. Whether Mr. Kaminsky disclosed or further used the trade secret files is irrelevant because the acquisition of the information "in and of itself constitutes misappropriation." *Edwards*, 2023 WL 4680774, at \*4 (rejecting the

argument that "no misappropriation occurred because [the defendant] has not disclosed any [of the plaintiff'] materials," explaining that such an argument "speaks to whether Defendant improperly misappropriated trade secrets through 'disclosure' of a trade secret, but says nothing to defeat Plaintiffs['] argument that Defendant 'acquired' Plaintiffs' trade secrets by 'improper means') (quoting 18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b)) (cleaned up)).

CoStar is vicariously liable for its employee's conduct because Mr. Kaminsky repeatedly accessed Move's trade secrets while employed at CoStar. Move and CoStar are not just in the "same industry," as the companies were in *Cisco*, 462 F. Supp. 3d at 1034; the misappropriated documents in this case relate to competing content creation strategies being employed by two direct competitors in the online residential real estate listings business. Realtor.com and Homes.com compete head-to-head for unique users and website traffic, Baldridge Decl. Ex. N; CoStar has recently invested hundreds of millions of dollars to create a mix of website content to drive users to its site, Baldridge Decl. Ex. K at 3; and the Trade Secret Documents contain large amounts of confidential information about Move's successful content creation platform, including its formula for increasing search engine optimization, Neuberger Decl. ¶ 14. The misappropriated information plainly benefits CoStar. Neuberger Decl. ¶ 8, 14. This is especially true here because CoStar has struggled to grow traffic using search engine optimization. *Id.* ¶ 7. There is a strong inference that Mr. Kaminsky misappropriated the trade secrets to benefit CoStar. *See Cisco*, 462 F. Supp. 3d at 1034. Further, statements from CoStar's leadership effectively concede Mr. Kaminsky was acting in the scope of his employment, saying he "has a right to earn a living, and he's not doing anything wrong." Baldridge Decl. Ex. G at 2. This is a form of ratification and another basis for holding CoStar vicariously liable for its employee's conduct. *See Cisco*, 462 F. Supp. 3d at 1057-58 (explaining that, as an alternative theory to *respondeat superior*, an employer may be liable for an employee's act under a theory of ratification, which "is generally applied where

an employer fails to investigate or respond to charges that an employee committed an intentional tort" (internal quotations omitted)).

Finally, Mr. Kaminsky's deletion efforts also evidence misappropriation. "Courts have found that in similar circumstances, deleting files from the computers allegedly used to misappropriate trade secrets is evidence of the alleged misappropriation." *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 848 (N.D. Cal. 2019) (collecting cases); *see also Brocade Comms. Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1216 (N.D. Cal. 2012) (deletion of files enough to raise genuine issue of fact as to existence of trade secret misappropriation). Here, Mr. Kaminsky **deleted 900-plus** files from a Move laptop and cleared his entire browsing history. Crain Decl. ¶¶ 11-12. Many of the deleted files were business files, and several were from the same Google Docs account that Mr. Kaminsky unlawfully accessed. *See, e.g.*, *id.* Ex. B at 34-35, 38-39.

### iii.    Damages or Threatened Damages.

Proof of threatened harm stemming from a defendant's misappropriation of trade secrets satisfies this element. *See First Foundation Inc. v. Giddings*, 2020 WL 1082641, at *5 (C.D. Cal. Mar. 7, 2020).

Here, there is ample evidence of a threat that Defendants will use the Move information they acquired. First, CoStar is a direct competitor, with a directly competing strategy to use content to grow traffic to its website. Neuberger Decl. ¶ 9. Second, CoStar would benefit greatly from being able to use the trade secrets at issue, especially Move's winning formula for search engine optimization. *Id.* ¶¶ 8, 14. Third, CoStar's leadership has refused to even criticize what Mr. Kaminsky did while employed by CoStar, instead choosing to ratify his misconduct, revealing a surprising propensity to support misconduct. *See, e.g.*, Baldridge Decl. Ex. L at 3 20:51-54. Fourth, Mr. Kaminsky downloaded one of Move's trade secret files, and forensic evidence suggests that it may be residing on a mystery computer. Pence Decl. Ex. B at 1; Crain Decl. ¶ 18. Fifth, Mr. Kaminsky destroyed nearly a thousand

16

files to cover his tracks.  Crain Decl. ¶ 12.  And sixth, as noted above, Mr. Kaminsky admits that, while employed by CoStar, he read Move's trade secret materials. Kaminsky Decl. ¶¶ 24-27, 40, 42.  He has already used the information—he claims implausibly it was just for the limited purpose of satisfying his curiosity.  Taken together, this evidence demonstrates a threat Defendants will use the information to Move's detriment.  *See First Foundation*, 2020 WL 1082641 (finding there were threatened damages where the competitor's access to the plaintiffs' "assembled information" would make it easier to target clients and use of the information would cause the plaintiffs to face "loss of customers, loss of employees, goodwill, and reputational damage" (cleaned up)).

### b. Move Will Prevail on its CFAA Claim.

Because Move has demonstrated likelihood of success on its trade secrets claim, the Court need not address its likelihood of success on the other claims.  *See Extreme Reach, Inc. v. Spotgenie Partners, LLC*, 2013 WL 12081182, at *7 (Nov. 22, 2013).  But they provide independent, additional grounds for injunctive relief here.

To prove a claim under the CFAA, based on a violation of 18 U.S.C. § 1030(a)(4), Move must show Defendants intentionally accessed a protected computer or computer network, through which Move conducts interstate commerce, without authorization or exceeding authorized access, and thereby obtained information, and that Move was damaged by at least $5,000.  *See LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009).

Mr. Kaminsky has admitted he accessed Move's electronic files, including while employed by CoStar, Kaminsky Decl. ¶¶ 18, 24-27, 40, 42, and he attempted to go back again into one of Move's secure files after he lost access, Pence Decl. ¶ 14 Ex. B.  Neither CoStar nor its employee were authorized to access the files stored in Move's cloud electronic file storage service.  Koutsantonis Decl. ¶ 12; Pence Decl. ¶ 15; Neuberger Decl. ¶ 15.  Additionally, Move's cloud-based

electronic storage system, and the files stored there, easily qualify as a protected computer or computer network under the plain statutory language as well as the case law of this District.  *See*, *e.g.*, *Calendar Research LLC v. StubHub, Inc.*, 2017 WL 10378336 at *7-8 (C.D. Cal. Aug. 16, 2017) (denying motion to dismiss CFAA claim; finding that Google Docs constitute "protected computer").[2]  The laptop from which Mr. Kaminsky deleted files similarly so qualifies.  Koutsantonis Decl. ¶ 12; Pence Decl. ¶ 12; Crain Decl. ¶¶ 11-12.

Move's computer networks necessarily allow Move to conduct interstate commerce.  Because Mr. Kaminsky is in New York (Baldridge Decl. Ex. A), Homes.com is in Virginia (*id.* Ex. B at 2), and Move is in California (Holbert Decl. ¶ 3), it is plain the computers and electronic files at issue were involved in interstate commerce.  *See also* Koutsantonis Decl. ¶ 14; Pence Decl. ¶ 16.  And, as a matter of law, Mr. Kaminsky's access to Move's computer systems after he stopped working for Move is deemed "without authorization."  *LVRC Holdings*, 581 F.3d at 1136.

As described above, Mr. Kaminsky's actions are attributable to CoStar.  Mr. Kaminsky accessed Move's electronic files dozens of times after he began working for CoStar, and the material accessed is relevant to his position at Homes.com.  *See SolarCity*, 2016 WL 11019989 at *5.  Additionally, Move has lost "at least $5,000 in value" due to the unauthorized access and deletions.  Gruenberg Decl. ¶ 6.

### c.  Move Will Prevail on its Contract Claim.

Move will also succeed on the merits of its contract claim against Mr. Kaminsky.  It must prove (1) the contract, (2) Move's performance of the

---

[2] A district court in the Ninth Circuit even found that a Google Doc *without* password protection qualifies as a "protected computer" under the CFAA. *Greeburg v. Wray*, 2022 WL 2176499, at *2 (D. Ariz. June 16, 2022) (inadvertently enabling the setting allowing anyone with the URL to access site did not render CFAA inapplicable). Here, Move's protections of its Google Docs are much stronger, with only authorized users able to access the files. *See*, *e.g.*, Holbert Decl. ¶ 11. Mr. Kaminsky was able to bypass this by using his authority, before departing Move, to add his Gmail account as an authorized user. Pence Decl. ¶ 14; Maas Decl. Ex. A (evidencing Gmail account was active in Move file on June 3, 2024).

contract or excuse for nonperformance, (3) Mr. Kaminsky's breach, and (4) resulting harm to Move. *See*, *e.g.*, *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014). Here, all elements are satisfied.

Move's contracts with Mr. Kaminsky (the Confidentiality Agreement and the Separation Agreement) are attached as exhibits to the declaration of Kat Koutsantonis. *See* Koutsantonis Decl. Exs. A-B. Move performed all elements of the contracts. *See id.* at ¶ 7. But, as described above, *supra* Section III.A.1, Mr. Kaminsky breached his promises in the Confidentiality and Separation Agreements by misappropriating confidential and trade secret materials, rather than keeping them in confidence as promised. Maas Decl. Ex. A; Pence Decl. Ex. A; Gruenberg Decl. Ex. A. He also did not return to Move all of its data as promised; instead, he repeatedly accessed and viewed Move's files after his termination and deleted nearly a thousand files and all his browser history. Pence Decl. Ex. B; Crain Decl. ¶¶ 11-12.

Move has been damaged by these breaches because the files Mr. Kaminsky accessed contain confidential information, now in the hands of a competitor. *See WeRide Corp.*, 379 F. Supp. 3d at 853-854 (loss of trade secrets is harmful); *Henry Schein, Inc.*, 191 F. Supp. 3d at 1077 (loss of accumulated data is harmful).

## 2. Move Will Suffer Further Irreparable Harm Without a Preliminary Injunction.

Loss of the economic value of accumulated data, in the trade secret context, constitutes irreparable harm. *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016). Additionally, it is "well established that the loss of market position and the disclosure of trade secrets can constitute irreparable harm." *WeRide Corp.*, 379 F. Supp. 3d at 853-854. That a defendant "could use or disclose the confidential materials . . . at any time" establishes a "strong threat of irreparable injury before trial." *Edwards*, 2023 WL 4680774, at *5 (internal quotations omitted). When a defendant is currently employed by a competitor of the plaintiff,

as Mr. Kaminsky is here, "this threat is not merely speculative." *Id.*

As detailed above, the unlawfully accessed files contain the formula for Move's success in differentiating itself from competitors by generating a calibrated mix of content that drives users to its site and maximizes search engine optimization. Holbert Decl. ¶¶ 7, 9; Maas Decl. ¶ 7; Neuberger Decl. ¶¶ 8-9, 12-14; Zimbert Decl. ¶ 6. Defendants' access to these materials could wipe out Move's competitive edge in using its News & Insights platform to drive significant traffic to Realtor.com and revenue to Move. This kind of loss of market position is "well established" as a basis for finding irreparable harm. *WeRide Corp.*, 379 F. Supp. 3d at 853-854; *see also Henry Schein, Inc.*, 191 F. Supp. 3d at 1077. Underscoring this, Mr. Kaminsky has already stipulated to irreparable harm. Koutsantonis Decl. Ex. A at 5. Similarly, CoStar argued recently to a court that the loss of trade secrets can cause severe and irreparable harm. Baldridge Decl. Ex. I at 5.

Moreover, like in *Edwards*, Mr. Kaminsky could use or disclose the Trade Secrets at any time. 2023 WL 4680774 at *5. He downloaded the Audience and Revenue, emailed himself the Employee Information, and accessed and repeatedly viewed the other Trade Secret Documents. Pence Decl. Ex. B. Additionally, as noted above, the Audience and Revenue Strategy that Mr. Kaminsky downloaded— i.e., the file "N&I Audience and Revenue for PMDLT"—was not among the documents he deleted from his Move laptop, which shows he likely downloaded it to a different computer. Crain Decl. ¶ 18. This threat of use or disclosure is particularly acute here because CoStar's leadership has boasted it has no intention of policing Mr. Kaminsky's conduct and sees nothing wrong with it. *See, e.g.*, Baldridge Decl. Ex. F. at 1, Ex. G at 1-2, Ex. L at 3 20:51-54.

### 3. The Balance of Hardships Tips Sharply in Move's Favor.

Before issuing a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation

marks and citation omitted).

The threatened harm to Move is substantial.  *See* Sections III.A.1.a.iii and III.A.2, *supra*.  Move's trade secrets are in the hands of its direct competitor.  Its computer systems were breached.  Pence Decl. ¶¶ 13-14.  Evidence has been destroyed.  Crain Decl. ¶¶ 11-12.  By contrast, there is no harm to Defendants—all Move seeks is an order precluding Defendants from future misappropriation of Move's trade secrets.  *See Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal. 2012) (injunction preventing further misuse of trade secrets "would not cause any significant hardship to defendant, because it would essentially only require him to abide by existing law").  The requested injunction does not preclude Mr. Kaminsky from working at CoStar.  It will not stop CoStar from lawfully competing.  And stopping further evidence destruction is not a legitimate source of harm to CoStar.

### 4. An Injunction Against Defendants Is in the Public Interest.

Finally, courts consider whether the issuance of an injunction would be in the public interest.  *Winter*, 555 U.S. at 24.  Here, the public interest will be served by granting Move's requested relief.  *See*, *e.g.*, *Henry Schein, Inc.*, 191 F. Supp. 3d at 1078 ("[T]he public interest is served when [a] defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with [his] employer.  Public interest is also served by enabling the protection of trade secrets").

### B.    Any Required Security Should Be Waived or Minimal.

A court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  Here, because of the nature of the relief requested and the lack of potential harm to Defendants, no security should be required.  Defendants would incur only minor costs, if any, in complying with the requested relief and those costs

are consistent with existing legal obligations.  *See Extreme Reach*, 2013 WL 12081182, at *10 (declining to order a security bond where the injunction merely enjoined the defendants from "they ha[d] no right to use in any event").

## IV.  <u>CONCLUSION</u>

Move requests the Court grant its proposed preliminary injunction.

Dated:  August 27, 2024                    JENNER & BLOCK LLP

By:  _Brent Caslin_____

Brent Caslin
David R. Singer
Elizabeth Baldridge
Carolyn S. Small

*Attorneys for Plaintiffs*

PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION

## <u>CERTIFICATE OF COMPLIANCE</u>

This certifies that Move's brief complies with the requirements of Local Rule 11-6. The brief contains 6,967 words as calculated by the word processing program.

August 27, 2024

_Brent Caslin_

Brent Caslin

PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION