JENNER & BLOCK LLP
Brent Caslin (SBN 198682)
bcaslin@jenner.com
David R. Singer (SBN 204699)
dsinger@jenner.com
Todd C. Toral (SBN 197706)
ttoral@jenner.com
Elizabeth Baldridge (SBN 313390)
ebaldridge@jenner.com
Carolyn Small (SBN 304938)
csmall@jenner.com
515 South Flower Street, Suite 3300
Los Angeles, CA  90071-2246
Telephone:  +1 213 239 5100
Facsimile:   +1 213 239 5199

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| MOVE, INC., a Delaware corporation; MOVE SALES, INC., a Delaware corporation; REALSELECT, INC., a Delaware corporation,<br><br>            Plaintiffs,<br><br>      v.<br><br>COSTAR GROUP, INC., a Delaware corporation; JAMES KAMINSKY, an individual; and DOES 1 through 10, inclusive,<br><br>            Defendants. | Case No. 2:24-cv-05607-GW-BFM<br><br>**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR:**<br><br>**(1) TRADE SECRET MISAPPROPRIATION UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836;**<br><br>**(2) TRADE SECRET MISAPPROPRIATION UNDER THE UNIFORM TRADE SECRETS ACT, CAL. CIV. C. § 3426 ET SEQ.;**<br><br>**(3) VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. §§ 1030(A)(2)(C), (A)(4), (A)(5)(B), (A)(5)(C);**<br><br>**(4) VIOLATION OF THE COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT, CAL. P. C. §§ 502(C)(1)-(3), (7);**<br><br>**(5) BREACH OF CONTRACT;**<br><br>**(6) PROMISSORY FRAUD**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Move, Inc., Move   Sales, Inc., and RealSelect, Inc. (collectively, "Move") hereby amend their first amended pleading and complaint and allege, on personal knowledge as to themselves and information and belief as to others, against Defendants CoStar Group, Inc. ("CoStar") and James Kaminsky, as follows:

## **INTRODUCTION**

1.    There is nothing wrong with lawful—even intense—competition. But competitors should never be allowed to cheat and steal to get ahead. Mr. Kaminsky, a former Move employee now employed by Move's direct competitor, CoStar, systematically invaded Move's secure computer systems, secretly exfiltrated Move's trade secrets, and spied on Move's real-time confidential electronic documents, including while he was working for CoStar. He unlawfully accessed Move trade secret files that, in the hands of a competitor, provide a massive unfair competitive advantage, and could help CoStar increase traffic to its competing real estate listing website, all to the detriment of Move.

2.    Plaintiff Move operates the residential real estate listings service located at Realtor.com, an industry leader in quality real estate listings as well as content delivering expertise and entertainment in the real estate world. Realtor.com benefits home buyers and sellers along with real estate brokers and agents by promoting residential real estate listings to consumers and delivering an audience to brokers and agents for listings and leads. Providing quality content on its website has been at the core of Realtor.com's successful strategy. For decades, Move has invested heavily to build Realtor.com into the nationally recognized brand and compelling user experience it is today.

3.    Realtor.com has been well established for years as one of the most-visited real estate listings websites in the United States. Based on reliable third-party measurements of website traffic, Realtor.com is the second-most-visited real estate listings website, behind Zillow and ahead of Redfin. Homes.com has not, until recently, been a significant player in the industry.

4.      CoStar, which historically focused on commercial real estate listings, acquired residential listings site Homes.com in 2021 and has since been on an aggressive mission to grow traffic to the fledgling site. CoStar publicly announced it was spending $1 billion in marketing and advertising for Homes.com and seeks to surpass Realtor.com's website traffic as quickly as possible. Having built up market and investor expectations to a fever pitch with its public pronouncements of supposed success, CoStar is desperate to boost traffic to Homes.com. CoStar is aggressively trying to increase traffic to Homes.com because online traffic and the number of site visitors are key to the success of any real estate listing website and the financial results of its business. Indeed, CoStar has recently invested hundreds of millions of dollars to grow its content offering on Homes.com.  The goal of this investment is to use content to differentiate Homes.com from competitors and increase visitors to the site.

5.      Realtor.com has succeeded in building up significant website traffic, and it uses various marketing strategies to increase and maintain that traffic, including traditional advertising on television and across the Internet. Realtor.com also relies on a strong, established, and successful "News & Insights" content platform as part of its product offering and to attract real estate professionals, consumers, and other visitors to Realtor.com. The News & Insights platform is featured prominently on the Realtor.com website. Publishing content to attract visitors to Realtor.com has been an important part of Move's strategy. The News & Insights team creates and publishes quality content, working with groups across the Realtor.com business and with others in the media to report and comment on real estate and related topics. The News & Insights platform is a market leading offering, generally viewed as the best in the business, that drives traffic to Realtor.com and creates significant authority for the brand. News & Insights is key to building Move's and Realtor.com's brand awareness, goodwill, and loyalty.

6.      CoStar hired the former head of Realtor.com's News & Insights group, Defendant James Kaminsky in March 2024. For nearly a decade before joining CoStar, Mr. Kaminsky led Realtor.com's News & Insights group, with knowledge of nearly every facet of the business, including strategy, financial investment and results, organizational structure, and operational details, all information that would be highly valuable to a business competitor focused on increasing its website traffic. He has referred to the News & Insights group at Realtor.com as "an essential branding and monetization engine for Realtor.com." Now at CoStar, Mr. Kaminsky is managing a team of writers. He has held himself out online as a "Content Strategist," "Senior Editorial Director," "Team Leader," and "Brand Builder." According to Mr. Kaminsky's LinkedIn profile (which, based on information and belief, he deleted after this lawsuit was filed), Mr. Kaminsky's employer is "CoStar," and his title is "Editor, Homes.com." Mr. Kaminsky manages and supervises a team of ten other employees at CoStar working to build up new digital content to attract website traffic in competition with Realtor.com.

7.      In June 2024, Move discovered that CoStar, through its employee, Mr. Kaminsky, brazenly and repeatedly accessed Move's confidential and trade secret information without authorization. Such information, in the hands of a competitor, provides a massive unfair advantage to CoStar as it builds its content offerings.

8.      As he departed Move, Mr. Kaminsky stole confidential business information, sending it to his personal email account on the last day he had access to Move's computer system. He established surreptitious, undetected ongoing access that allowed him, as a CoStar employee in a division that develops content for Homes.com, to spy on Move's highly confidential documents stored on protected computer systems. In an apparent attempt to cover his tracks, and following Move's termination of his employment, Mr. Kaminsky also deleted nearly a thousand files from his password-protected Move computer. He deleted a large number of business

documents, including electronic files that appear to be related to Realtor.com's content, plans, and strategy, as well as documents regarding the employees on the Realtor.com News & Insights team. Mr. Kaminsky also wiped clean his entire browsing history before finally, in late February 2024, returning to Move its laptop computer. The browsing history deleted from the Move-issued laptop is irrecoverable.

9.      Since he left Move, for several months, including a significant period of time in which he was employed by CoStar, until he was caught red-handed in a confidential Move document, Mr. Kaminsky unlawfully exploited ongoing access to Move's confidential and trade secret information which was being updated on a regular basis by unsuspecting Move personnel in real-time. The valuable information relates to business strategy, employee lists and contact information, employee salary information, internal budgeting, industry contact lists, third party collaborations, publication subjects, publishing schedules, assignments, financial analyses, and a vast array of other competitively sensitive and valuable information regarding Move's Realtor.com business. Mr. Kaminsky spied on Move's confidential documents at least 37 times after CoStar hired him.  He was only stopped from accessing Move documents after a Move employee discovered him in real-time accessing a confidential electronic Move file, at which point Move blocked the access method he had established in his last days at Move. Even then, after waiting a week, Mr. Kaminsky tried again to access a confidential Move document but was blocked.

10.     Mr. Kaminsky's accessing and viewing the misappropriated Move information is within the scope of his employment by CoStar as a content editor for Homes.com.  Mr. Kaminsky's unlawful conduct—accessing and viewing a competitor's confidential electronic files and trade secret information relating to the business of creating content for an established residential real estate portal (Realtor.com) while simultaneously working to create content for another residential

real estate portal (Homes.com) —was an extension of his employment with CoStar. Mr. Kaminsky's conduct was not simply incidental to CoStar's business; rather, it went to the heart of an important business objective at CoStar and his role at CoStar, namely, the creation of quality content to drive website traffic to a residential real estate listings website. The files and information Mr. Kaminsky accessed would surely benefit and aid CoStar's high-priority objective of creating quality content and increasing online traffic to Homes.com.

11.    Mr. Kaminsky also committed promissory fraud and breached multiple promises he made in his employment contracts with Move. He promised when leaving Move, while accepting a generous severance package, that he had returned all material belonging to Move. That promise was knowingly false and made to induce Move's reliance on Mr. Kaminsky's false promises. When he made those promises, Mr. Kaminsky was already actively accessing Move's documents without authorization and had set up a system that would give him future unauthorized access to Move's electronic files. Mr. Kaminsky also violated federal and state anti-computer fraud laws by accessing without authorization Move electronic documents stored on protected computer systems.

12.    CoStar and its employee Mr. Kaminsky must be held accountable. Move requests that this Court stop Defendants' unlawful competitive tactics and hold them liable for computer fraud and trade secret misappropriation, enjoining Defendants from unlawfully accessing Move's protected computers and misappropriating Move's trade secrets.  Move further requests that the Court hold Mr. Kaminsky liable for his breaches of contract and for his fraudulent promise to protect Move property as he implemented a scheme to do the opposite.  As a result of Defendants' misconduct, Move is entitled to its actual damages, lost profits, compensation for harm to Move's reputation and the diminution in value of its trade secrets, disgorgement of amounts by which Defendants have been unjustly enriched, and available statutory damages.  Move is also entitled to exemplary damages.  Move

is further entitled to an award of the costs of this proceeding, including all attorneys'
fees and associated costs, court costs, and pre- and post-judgment interest, pursuant
to applicable statutes and contracts.

## PARTIES

13.   Plaintiff Move, Inc. is a Delaware corporation with significant
operations in California, including in Santa Clara, Santa Clara County, California
and Westlake Village, Los Angeles County, California. Move operates the real estate
listings service located at Realtor.com.

14.   Plaintiff Move Sales, Inc., is a Delaware corporation and a wholly
owned subsidiary of Move, Inc.  Move Sales, Inc. employed Defendant James
Kaminsky from June 2015 through January 2024.

15.   Plaintiff RealSelect, Inc., is a Delaware corporation and a wholly
owned subsidiary of Move, Inc.  RealSelect, Inc. is the entity that operates and does
business as Realtor.com.

16.   Defendant CoStar Group, Inc. is a Delaware corporation with offices
nationwide, including in Irvine, California, Los Angeles, California, San Diego,
California, and San Francisco, California. CoStar owns and operates the real estate
listings service located at Homes.com as well as other websites, including
Apartments.com,    ForRent.com,    CorporateHousing.com,    Land.com,    and
LandandFarm.com.

17.   Defendant James Kaminsky is an individual who resides in the state of
New York, but who previously worked for Move Sales, Inc., headquartered in
Westlake Village, California and who signed a written employment contract with
Move agreeing that California law would govern their agreement. Mr. Kaminsky
was formerly employed by Move Sales, Inc. from June 2015 to January 2024,
leading the News & Insights team for Realtor.com. He is now employed by CoStar.
According to Mr. Kaminsky's LinkedIn profile, he began working for CoStar in
March 2024.

SECOND AMENDED COMPLAINT

18.    Move is informed and believes, and on that basis alleges, that Defendants DOES 1 through 10, inclusive, are individually and/or jointly liable to Move for the conduct alleged herein. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive, are unknown to Move at this time. Accordingly, Move sues Defendants DOES 1 through 10, inclusive, by fictitious names and will amend this Complaint to allege their true names and capacities once ascertained.

## **JURISDICTION AND VENUE**

19.    Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this action based on the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. This Court has supplemental jurisdiction over the other claims pled herein pursuant to 28 U.S.C. § 1367.

20.    This Court has personal jurisdiction over CoStar Group, Inc. because it conducts a substantial amount of business in California. CoStar has physical offices in Irvine, California, Los Angeles, California, San Diego, California, and San Francisco, California. CoStar also conducts business in California and owns and operates multiple websites that target California, including Homes.com, Apartments.com, ForRent.com, CorporateHousing.com, Land.com, and LandandFarm.com. A substantial part of CoStar's misconduct occurred in California, including its unlawful electronic access of multiple confidential Move documents that were created by Move personnel in California and managed by those Move personnel in California. CoStar's unlawful conduct targeted California, since CoStar was aware that Move's headquarters are in California, that the Move personnel who created and managed the documents at issue are in California, that Move has significant relevant operations in California, and that harm to Move would be felt in California.

21.    This Court has personal jurisdiction over James Kaminsky because a

substantial part of his misconduct occurred in California, including his unlawful access of multiple confidential Move documents that were created by Move personnel in California and managed by those Move personnel in California. Mr. Kaminsky's unlawful conduct targeted California, since he was aware that Move's headquarters are in Santa Clara, California and that Move has significant operations in Westlake Village, California, that the Move personnel who created and managed the documents at issue are in California, and that harm to Move would be felt in California. Mr. Kaminsky was also aware that any dispute with Move would likely be litigated in California when he agreed that California law would govern his written agreement with Move.

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because, as described above, a substantial part of the events or omissions giving rights to the claims pled herein against it occurred in the Western Division of this District.

## FACTUAL ALLEGATIONS

23.    In the real estate listing website industry, website traffic is critical. Homes.com and Realtor.com make money by, among other things, providing real estate agents prime placements for their online listings. Because consumers want to use, and real estate professionals want to advertise on, the most popular platform, size matters. In other words, website traffic is the lifeblood of the online real estate listings business.

24.    There is an entire industry devoted to providing independent comparative measurements of web traffic. According to every independent third-party source Move can identify—such as Comscore, Nielsen, Similar Web, or SEM Rush—Realtor.com has for years been the second most-visited residential real estate listings website in the United States, behind Zillow and ahead of Redfin. By every independent third-party measure, Homes.com is last among the top four.

25.    Desperate to increase its presence as a leading real estate listings site, CoStar has invested heavily to develop content for Homes.com to boost its website

traffic. In July 2024, CoStar's CEO said at a conference that CoStar had a thousand people collecting and building content. The purpose of this army of content creators is in part to increase search engine optimization, which in turn increases website traffic. CoStar's access, through one of its employees, to a competitor's strategy for driving traffic to its site, including a detailed analysis of which content is performing best, sources of traffic, content publication schedules, strategic decisions and pivots, content plans, and other similar confidential information is hugely beneficial to CoStar. CoStar's employee misappropriated from Move trade secret documents that provide a blueprint for Move's highly effective platform for creating content and driving traffic to Realtor.com. Access to this blueprint would allow a competitor to replicate Realtor.com's effective content strategy, structure, and operations, thereby giving it a significant boost in launching any competing digital product and building an engine to drive additional website traffic.

## **Move's Highly Successful Realtor.com Business**

26.    Realtor.com's number two spot among the online real estate portals has been hard won. It is the result of several interwoven strategies, implemented over more than a decade. Realtor.com is considered the gold standard for real estate listings based on its use of Multiple Listing Service (MLS) listings sourced from hundreds of regional databases, and its affiliation with the National Association of Realtors (NAR). Move has the exclusive license from the NAR (which owns the "Realtor" mark) to use the Realtor.com URL for its business. In addition to real estate listings, Realtor.com provides other insightful information, tools, and professional expertise to those who visit the site. Homebuyers and sellers can track a property's value, view neighborhood market trends, read articles about real estate markets and specific properties, learn about economics and market data, catch up on trends, peruse celebrity real estate stories, and see other interesting aspects of the website. Much of this valuable content is created and published by the News & Insights team at Realtor.com.

27.    Realtor.com's News & Insights platform is one of several methods to differentiate Realtor.com from its competitors, drive user traffic to Realtor.com, and maintain that traffic over time. It is a successful strategy; and in addition to driving traffic, it also creates enormous authority for the Realtor.com brand. News & Insights provides a competitive advantage to Realtor.com because Move has invested heavily in news-and-insights-type coverage compared with peer websites. As a result of its success, News & Insights enjoys a prominent location at the top center spot on the homepage at Realtor.com.



28.    The News & Insights tagline is "Your Home For All Things Real Estate." Like a virtual newspaper on the Realtor.com website, News & Insights includes several different sections representing market segments, with stories relevant to each: Buying, Selling, Renting, Finance, Home Improvement, Celebrity Homes, News & Trends, and Living. News & Insights publishes daily journalistic stories alongside videos to provide best-in-class real estate content and drive consumer traffic to Realtor.com.

29.    News & Insights is highly integrated with the wider Realtor.com site, and it operates in several ways to promote the overall goal of attracting site visitors. Its creative content informs and entertains a wide audience. That content also builds

SECOND AMENDED COMPLAINT

and promotes the Realtor.com brand. News & Insights' integration with the wider Realtor.com site helps the site promote specific listings, brokers, and agents.

30.    The News & Insights team at Move works actively with the company's Economics team to identify, curate, and develop content for the website and for external content placement. The content frequently focuses on economic trends, views on market dynamics, and the future of the housing market. The Economics team also produces a weekly video for Realtor.com that is accessible through the News & Insights section of Realtor.com.

31.    Working hand in hand with the News & Insights platform and Economics team is Move's public relations program. This program is based on years of business know-how and understanding of what consumers and third-party sites are interested in and how Move can best raise Realtor.com's profile through external media. Move's public relations professionals use the company's network of connections, years of proven experience, business relationships, and particular methods to advance the company's strategy. Their efforts raise Realtor.com's profile and encourage more visits to the website.

32.    Like many other online companies, Move carefully monitors trends and traffic patterns on its website. Understanding which content subjects and specific articles are popular (or not) over time helps the Move team learn more about Realtor.com's customers and audience, helping Move improve decisions regarding content, increasing the value of the content and bringing in even more site visitors to Realtor.com. As Mr. Kaminsky explained, the "News & Insights section [was built] into an industry-leading housing advice, news, and entertainment site for mass consumers—and an essential branding and monetization engine for Realtor.com." It is the metrics and detailed analysis and strategy behind this content-driven "monetization engine," developed over many years, that Defendants

misappropriated without the investment or years of effort it would have otherwise taken to develop legitimately.

### CoStar Aggressively Pushes into the Residential Portal Market

33.     CoStar has for some time dominated the market for online *commercial* real estate listings. It owns LoopNet, a successful online marketplace for commercial real property. In April 2021, CoStar made its foray into the residential real estate listings market by purchasing Homes.com. At that time, Homes.com was a small residential real estate listing platform receiving only about 5,000,000 unique monthly visitors.[1]

34.     In 2023, CoStar embarked on a substantial investment to advance its fledgling Homes.com business, declaring it would invest heavily into its Homes.com site and work relentlessly to grow it to overtake Realtor.com. Leadership at CoStar has stated repeatedly that Homes.com would focus on marketing and growing visitors to Homes.com. CoStar's Form 10-K filing dated February 2024 further detailed the company's "Homes.com monetization strategy." That filing also stated CoStar's goal of "grow[ing] the numbers of users of, and subscribers to and advertisers on, our marketplaces" including Homes.com. As CoStar stated, that goal necessarily involves "enhanc[ing] user and advertiser awareness of [CoStar's] brands."

35.     CoStar recently began what it has called the largest real estate platform marketing campaign in history, for the purpose of driving traffic to Homes.com and more effectively competing with Zillow, Realtor.com, and Redfin. As part of its aggressive campaign, CoStar publicly declared it would spend $1 billion in

---

[1] *See* "CoStar Group to Acquire Residential Listing Site Homes.com," April 14, 2021, https://www.costargroup.com/costar-news/details/costar-group-to-acquire-residential-listing-site-homes.com (stating, as of April 2021, that "[a]pproximately 5 million people visit the Homes.com website each month").

advertising for Homes.com, with, for example, multiple television advertisements appearing in the 2024 Super Bowl telecast.

36.    As part of its broad strategy to drive up website traffic, CoStar apparently wants to create a rival content platform. It has created and published on its Homes.com website articles on subjects such as homeowner associations, loan products, the best cities to live in, house-selling advice, and other subjects of interest to those in the real estate industry and consumers who may be looking for residential real estate. CoStar maintains a blog on its Homes.com website with an "Insights" category that includes more than 50 articles. New articles are posted on the blog every few days. A screenshot of Homes.com's "Insights" page is below.



CATEGORY:
Insights
51 ARTICLES



🗁 INSIGHTS

The Safest Neighborhoods in Atlanta for 2024

With its vibrant sense of history, culture and commerce, Atlanta, Georgia, welcomes tens of thousands of new residents every year....



🗁 INSIGHTS

Everything You Need to Know About Living in San Francisco

San Francisco is well known for its iconic landmarks and unique natural landscape. Additionally, the city's creative and passionate people...



🗁 INSIGHTS

What's It Like to Live in San Diego?

When you tell someone you live in San Diego, California, it's not uncommon to hear an envious comment about the...

37.    CoStar has not had an internal news platform at Homes.com nor a strong public relations program for the website. In Spring 2024, however, CoStar hired Mr. Kaminsky after his departure from leading the News & Insights team at Realtor.com. CoStar also began advertising for a new role: Director of PR & Communications for Homes.com. According to CoStar's recruiting advertisement, it sought to hire a Director to "develop and implement a comprehensive

communications strategy that will grow awareness, engagement, media impressions, and share of voice for the Homes.com brand, and to promote the brand to key media outlets as the leader in the residential industry, rental market industry and consumer insights space."

38.    There have been inconsistent statements from Defendants about the precise nature of Mr. Kaminsky's role at CoStar. CoStar's CEO labeled Mr. Kaminsky a "relatively junior employee writing descriptions of condominium buildings in New York City." But Mr. Kaminsky held himself out on LinkedIn as a "Content Strategist," "Senior Editorial Director," "Team Leader," and "Brand Builder." He has over the past two decades served companies as an "editorial executive," "top editor," "top creative executive," "chief content officer," "editor in chief," "executive editor," and "senior editorial director." Mr. Kaminsky's title at CoStar is "Editor, Homes.com." While CoStar's CEO asserted that Mr. Kaminsky is a junior employee and Mr. Kaminsky's LinkedIn profile labeled his roles and experience as senior, the General Counsel of CoStar has stated that Mr. Kaminsky is a "mid-level manager." The accurate specifics of Mr. Kaminsky's role and duties at CoStar—whether he is junior, mid-level, or senior—will be revealed in discovery. But whatever the specifics, there is no doubt his position at CoStar involves creating and editing content for a residential real estate listings website for the purpose of driving traffic to that website. Nor is there any doubt that the trade secret documents misappropriated from Move relate to its business of creating and editing content for a residential real estate listings website for the purpose of driving traffic to its website. The misappropriation of Move's documents is highly relevant to and inherent in Mr. Kaminsky's work for CoStar.

39.    Mr. Kaminsky's exfiltration of company information including compensation details for key members of the Realtor.com News & Insights team, and his access to confidential, internal Move documents relevant to the setup and operations of those teams, provides to CoStar a significant—and unfair—

competitive benefit. As Move's competitor, CoStar, through its employee Mr. Kaminsky, is able to enjoy Move's decade of experience, know-how, and competitive trade secrets, which were developed at great expense and with much trial and error. CoStar can use those trade secrets to, if it chooses, develop and launch a competing product or improve CoStar's existing platform. CoStar, through Mr. Kaminsky, has unauthorized access to nearly every aspect of Realtor.com's News & Insights internal data and metrics. This benefit has not yet been quantified in terms of commercial value but encompasses years' worth of proprietary business methods and trade secret information integral to designing, constructing, and operating Move's successful Realtor.com strategy.

### Misappropriated Documents Contain Move's Valuable Trade Secrets

40.    As alleged above, Realtor.com's News & Insights platform is a significant driver of traffic to Realtor.com, a source of authority and value for its brand, and a "monetization engine" for Move. And, like any press outlet, News & Insights derives value and success from its ability to identify, develop, and generate compelling content to attract, build, and maintain an audience. Move does this using years of experience and deep knowledge of its business and audience to identify, curate, and develop stories that will most effectively drive traffic to Realtor.com, promote the Realtor.com brand, and bring value to its professional real estate customers. Similarly, Move's public relations program (managed by Move's Communications team) is successful in large part because of its contacts, relationships, and knowledge in the media world. These teams work together. They maintain confidential documents containing valuable information about the team's in-progress stories, ideas for future stories, and the way those planned and proposed stories tie into wider Realtor.com efforts, going to the heart of the team's journalistic function. The documents also identify communication strategies, ongoing communications with third parties regarding stories and collaboration efforts, and valuable lists of third-party sources, including contact information and affiliation

information. These and other electronic documents are stored by Move personnel on protected computer systems.

41.     One such electronic document is a confidential strategy presentation titled "N&I Audience and Revenue for PMDLT." The presentation assesses and analyzes the impact of certain types of website content on user engagement and traffic growth.  It explains the different categories of content Move publishes on its site and the carefully calibrated mix of content that Move uses to maximize traffic and engage users. It also contains confidential information about how Move syndicates content to engage and attract users to Realtor.com, discusses Move's strategies for search engine optimization, including its return on investment, contains data about its effectiveness at attracting visitors who become potential leads for real estate professionals, and conveys that the News & Insights content team at Realtor.com is one of the most important differentiators between Realtor.com and its several competitors. In short, it contains a wealth of competitive intelligence that any company in the online residential real estate listings business could use to adjust or improve its own advertising spend and search engine optimization tactics.

42.     Another important and confidential Move electronic file is referred to as the "Comms + Econ + N&I Project Call" document. After Mr. Kaminsky unlawfully accessed and viewed this document, Move stopped using it and migrated the information to a new document. The substance of this several-hundred-page document is a treasure trove of competitively valuable information, reflecting the strategy, shared information, and decision making that takes place in regular meetings between the Communications, Economics, and News & Insights teams. The version of the Comms + Econ + N&I Project Call document that Mr. Kaminsky accessed is a "living," electronically stored document, owned and managed by Move's Westlake Village, California team. Users with authorization to access it can log on and see edits and updates that other users have made to the document. The document contains valuable information pertaining to traffic data for each of

Realtor.com's top-performing stories, including page views and the sources of that traffic, the stories Realtor.com will run, strategic pivots the teams are making, metrics about which stories are performing best (and which subjects / stories are not performing), and how Realtor.com is using those metrics to inform its plans for News & Insights. The Comms + Econ + N&I Project Call document also contains lists of the reporter contacts the company has garnered over the years, those reporters' beats and interests, ongoing projects, and other key information integral to the success of Move's strategy. Move uses the information contained in the Comms + Econ + N&I Project Call document as a detailed business plan for the entire News & Insights, Communications, and Economics strategy of Realtor.com, rich with information about how those teams operate, how they work together, and how they contribute to the platform's wider success. The version Mr. Kaminsky accessed was updated weekly by Move personnel and contains nearly four years of confidential information.

43.    Another document containing Move's trade secret information is referred to as the "Editorial Budget." This document is updated daily by Move personnel and provides hour-by-hour information about the content that will appear on Realtor.com. It reflects the experience and business methods used to develop stories that will most effectively attract an audience and drive traffic to Realtor.com. The document is a real-time road map for Move's strategic timing and planning of its news content. Like the Comms + Econ + N&I Project Call document, the Editorial Budget is a "living," electronic document that authorized users can log into and access using their Move credentials.

44.    Move also maintains internal documents that lay out its planned future strategies for its News & Insights platform that are not publicly known.

45.    As News & Insights serves as a journalistic arm within Move, these documents are at the heart of its business and competency.

46.    The documents described in the preceding paragraphs are examples of documents containing Move's confidential and proprietary information. Move maintains many additional documents with such information, critical to its search engine optimization strategy and managing the collaborative efforts of its News & Insights, public relations / Communications, and Economics teams.

47.    These documents and other materials, as a whole, constitute a detailed blueprint of confidential and proprietary documents that reveal core business strategies for driving traffic to Realtor.com and form the basis for running the News & Insights platform as integrated with other aspects of the company. There are dozens to hundreds of individual confidential documents and pieces of valuable information that, together, are essential ingredients for building and running a successful News & Insights team and platform.

48.    The trade secrets in these documents fall into several categories, including but not limited to the following:[2]

      a.    Site traffic and unique user data and metrics related to content on Realtor.com, including information about high- and low-performing content, sources of traffic of Realtor.com, and strategy showing how those metrics will influence the future direction and content of the site;

      b.    Strategies and tactics concerning the mix of content on Realtor.com, including data as to page views of certain subject matters and real-time information about the topics and content of stories that will appear on Realtor.com before they are published;

      c.    Search engine optimization strategies and tactics, including using content to generate organic, high-quality traffic to

---

[2] To safeguard its confidential and proprietary information, Move is intentionally withholding details of its strategy, internal plans, financial analyses, and trade secrets from this pleading. Move will continue to furnish such information as needed with appropriate confidentiality protections in place as this litigation progresses.

Realtor.com, and deriving further value from the News &
Insights platform;

d.    Financial data and analyses, including Move's investment,
spending, revenue, and profits derived from the publication of
content on Realtor.com and syndication of Realtor.com content
through distribution channels;

e.    Strategies and tactics for managing the structure and operations
of, and successfully running, the News & Insights and
Communications teams in support of Move's Realtor.com
business;

f.    Strategies and tactics for using content on Realtor.com to amplify
Move's brand among consumers and real estate professionals;

g.    Information concerning conversion of Realtor.com website
visitors into monetizable leads for real estate professionals;

h.    Plans and strategies for working with other news and media
organizations to grow traffic and unique users for Realtor.com;

i.    Plans and concepts for future article content subject matter on
Realtor.com;

j.    Competitive research and intelligence concerning social media
exposure for online residential real estate portals;

k.    Compilations of public relations and/or news reporter identities,
contact information, and relationship data concerning particular
reporters such as content interests and ongoing projects; and

l.    Lists of employees, their roles and responsibilities within the
organization, and employee compensation information.

49.    Move's trade secrets derive independent economic value from not
being generally known to, and not being readily ascertainable through proper means
by, Move's competitors (like CoStar) or other persons who can obtain, extract, or

exploit economic value from the disclosure or use of the information. These documents, in the hands of a competitor, would be incredibly valuable to the competitor and very harmful to Move. Just as a newspaper would gain an advantage from being able to scoop a rival publication's stories and see the internal processes that drive its success, here, another real estate listings site would gain immense value from reading the key documents at the center of Realtor.com's successful content creation and communications team. Confidential information about the operations of Move's highly successful platform and team, including its composition, meeting schedules, internal processes, areas of responsibility, reporting structures, financial impact, and work-streams are similarly incredibly valuable to a rival that is looking to improve its content engagement and increase the number of visitors to its site.

50.    Move has taken numerous steps to ensure the confidentiality of its confidential information, including the misappropriated documents at the center of this case. These efforts include (a) requiring employees to sign confidentiality agreements in connection with their employment and acknowledge employment policies containing confidentiality provisions; (b) requiring departing employees to confirm confidentiality protections; (c) requiring vendors to sign confidentiality agreements; (d) implementing physical security on office locations, including physical barriers, keycard access, and locks on doors; (e)  password requirements for local and computer network access; (f) multifactor authentication for access to the Move network; (g) use of security software and firewalls; (h) encryption of employee laptops; and (i) training for employees that includes security and confidentiality components.

**Mr. Kaminsky's Access to and Promises to Protect Confidential Information**

51.    Mr. Kaminsky began employment with Move Sales, Inc. in June 2015, and for nearly a decade he ran Move's News & Insights department. By the end of his employment, his title was Senior Editorial Director, and he led the News & Insights team. In this role, Mr. Kaminsky regularly accessed the News & Insights

and Communications teams' key documents, including the N&I Audience and Revenue for PMDLT document, Comms + Econ + N&I Project Call document, Editorial Budget, and others.

52.    When Mr. Kaminsky started his employment with Move, he signed a contract titled "Employee Invention Assignment and Confidentiality Agreement" ("Confidentiality Agreement"). There, Mr. Kaminsky acknowledged that while working for Move he would have access to the company's trade secrets and confidential information. He agreed to hold such information in "strict confidence and trust," and not to "use or disclose it" "without the prior written consent" of Move. Mr. Kaminsky also agreed that, upon termination of his employment with Move, he would "not take with [him] any documents or materials or copies thereof" containing Move's confidential or trade secret information. Also in the Confidentiality Agreement, Mr. Kaminsky agreed he would notify Move in writing of any employment he accepted for one year following the end of his employment with Move. The Confidentiality Agreement specified that the notice was to be provided "in writing by U.S. Mail, return receipt requested, within ten (10) calendar days of accepting employment with any other employer[.]" The notice was required to "include the name, address, and telephone number of the new employer(s), the date employment begins, and the duties to be performed[.]"

### Mr. Kaminsky Departs Move and Exfiltrates Trade Secrets to CoStar

53.    On or about January 10, 2024, Move notified Mr. Kaminsky that his position at the company would end as part of a reduction in force. Mr. Kaminsky was notified that his last working day would be January 12, 2024, and his employment would officially terminate on January 19, 2024.

54.    Also on January 10, 2024, Move provided Mr. Kaminsky with a written offer titled "Terms of Separation," which, if accepted and countersigned by Mr. Kaminsky, would constitute his separation agreement with Move ("Separation

Agreement"). The Separation Agreement provides that Mr. Kaminsky would receive a substantial severance payment, along with other benefits.

55.    Mr. Kaminsky signed and returned the Separation Agreement to Move on January 25, 2024. When he did, he "represent[ed] and warrant[ed]" in writing that he had returned to Move, or would return to Move as soon as reasonably practicable, "all tangible or intangible property or data" belonging to Move, "of any type whatsoever[.]" Mr. Kaminsky also promised that he would "continue to be bound by the terms of the Confidentiality Agreement" and that he would hold all confidential and trade secret information "in the strictest confidence," and would not make use of such information "on behalf of anyone." He confirmed he had "delivered to [Move] all documents and data of any nature" containing or pertaining to confidential or trade secret information, and that he had "not retained any such documents or data or any reproduction thereof."

56.    In or before March 2024, Mr. Kaminsky began working for Move's competitor CoStar as Editor for Homes.com. According to Mr. Kaminsky's public LinkedIn resume, he is employed by "CoStar Group" and was hired to "oversee[] the development and execution of a dynamic new category of luxury housing coverage" for Homes.com. His role, according to his LinkedIn profile, includes "[m]anaging and editing a team of 10 full-time architecture and style writers to create unique reported content[.]" Mr. Kaminsky did not notify Move he had accepted employment with CoStar, as he promised Move he would. On information and belief, Mr. Kaminsky withheld this information from Move to avoid detection of the misconduct outlined in this Complaint.

57.    After Mr. Kaminsky started working for CoStar, Move discovered that Mr. Kaminsky had exfiltrated confidential and trade secret material in his last days working for Move, creating for himself ongoing surreptitious access to Move's live internal electronic documents. In the days after Mr. Kaminsky was notified that his employment with Move would terminate, he used his Move email address to send

his personal Gmail email account dozens of emails containing Move information. Among other items, on January 12, 2024, Mr. Kaminsky emailed himself employment summaries of several of the individuals on the Realtor.com News & Insights team, including their job titles, descriptions, and salary and other compensation information. After initially swearing under oath that he no longer had access to these employment summaries and other Move documents, Mr. Kaminsky confessed that the employee summaries remain in his inbox.

58.    Move also discovered that, after Mr. Kaminsky's last day of employment with Move, but before he returned to Move a company-issued, password-protected laptop that had been in his possession, Mr. Kaminsky deleted a massive volume of files and data from that company-issued laptop. On February 19, 2024, Mr. Kaminsky deleted nearly a thousand electronic files from the Move laptop and deleted his entire browsing history before shipping it back to Move. Although Defendants suggest the focus of Mr. Kaminsky's efforts to collect and delete data was personal (*e.g.*, CoStar's CEO has stated "He didn't do anything wrong, he had his personal stuff on his computer, and he was just taking his personal stuff," and Mr. Kaminsky submitted a declaration to the Court stating "I think the act of deleting my personal files, emails and browser history is basic privacy hygiene"), a large number of the files Mr. Kaminsky deleted were not personal but appear from their file names to be business files related to Move plans, strategy, and employees. A number of the deleted files also appear from their file names to be from the same secure electronic cloud storage service that Mr. Kaminsky repeatedly accessed after he left Move.

59.    In addition, Mr. Kaminsky admits that on January 11 and 12, 2024, he used his Move email address to grant access to his personal Gmail address for several of Move's internal documents stored on protected computer systems. The documents to which he granted himself access included the Comms + Econ + N&I Project Call document, the Editorial Budget document, confidential documents containing

Move's plans and strategies for deriving further value from the News & Insights platform, and more. Ongoing access to these documents would allow Mr. Kaminsky to continue to access, copy, and spy on Move's internal documents from outside the company after he departed Move. He could print them or download them, take screen shots, and generally enjoy surreptitious access to highly sensitive information he knew would be updated daily or weekly by the team at Realtor.com.

60.    Mr. Kaminsky admits that he accessed and viewed Move documents numerous times in the following months, including after he began working for CoStar, going undetected until June 2024. Indeed, the documents' internal logs indicate that Mr. Kaminsky accessed Move's documents at least 37 times after he began working for CoStar in March 2024. This access included viewing and spying on Move's regularly updated Comms + Econ + N&I Project Call and Editorial Budget documents, which provided real-time updates on the News & Insights and Communications teams' planning, strategy, and other confidential information. It also included downloading and/or printing, as well as repeatedly accessing and viewing the document "N&I Audience and Revenue for PMDLT," which contained granular viewer-engagement data regarding types of content published by the News & Insights team, detailed data regarding site users and traffic, and sources of traffic to the site. After initially denying under oath that he printed this or other documents, Mr. Kaminsky admitted he had in fact printed a portion of the "N&I Audience and Revenue for PMDLT."

61.    Mr. Kaminsky, a CoStar employee responsible for managing a team of content creators, was accessing Move's highly confidential trade secret files (and thus acquiring knowledge of Move's trade secrets) regarding Realtor.com's content strategy and operations, repeatedly returning to access the trade secret files because he knew the information was being regularly updated by Move personnel. At the time Mr. Kaminsky's unauthorized access was discovered and promptly cut off in early June 2024, the documents provided specific updates and planning stretching

months into the future, through August 2024. The unlawfully accessed documents, however, contain strategy and planning trade secret information that are still being relied on by Move and are at the core of Move's business. They are therefore relevant well beyond August 2024.

62.    Move has incurred costs exceeding $5,000 as a result of Mr. Kaminsky's unauthorized access to Move's protected computer systems. The infiltration of Move's internal systems disrupted and economically impacted the company, its personnel, and its business. Since the first day Mr. Kaminsky's unauthorized digital presence was discovered in Move's confidential business documents, Move employees, including some in management and executive positions, have had to devote some of their working hours to addressing, investigating, and remedying that security breach. The investigation diverted those employees away from their regular business activities. It involved an IT security response, interviews, and assessments of the breach. Part of the security response also involved taking steps to secure Move's computer systems and prevent Mr. Kaminsky from being able to continue accessing Move's secure Google Drive. Ultimately, more than a dozen Move employees had their work disrupted as they diverted attention away from their usual tasks, spending valuable time assisting with the investigation into Mr. Kaminsky's misconduct over a four-week period.

63.    In addition, Move retained a forensics expert to investigate the scope of Mr. Kaminsky's intrusions and to assess the damage he caused.  As part of the forensic expert's investigation, Move learned that Mr. Kaminsky deleted nearly a thousand electronic files from his Move laptop and deleted his entire browsing history, irretrievably destroying those files and data.

64.    Despite serious allegations that one of CoStar's employees had misappropriated sensitive and confidential information, including trade secret information, from its competitor Move, CoStar's general counsel publicly called the claims "the pimple on the elephant of [his] litigation (duties)" and "not even

something [he was] going to think about." Moreover, after being sued over its employee's theft of Move's trade secrets and learning about Mr. Kaminsky's unauthorized access to Move's electronic files while employed by CoStar, CoStar's CEO did not publicly admonish Mr. Kaminsky or apologize for his unlawful conduct; instead, he appeared to endorse the conduct by publicly declaring that the lawsuit was "laughable" and CoStar's employee didn't do anything wrong. But there is plainly nothing laughable or appropriate about Mr. Kaminsky's conduct. Unlawfully accessing a competitor's secure electronic files and stealing trade secrets that would help CoStar design and build a copy of a highly successful component of Move's business is unlawful and contrary to fair competition.

65.    Although CoStar insists that Mr. Kaminsky did nothing wrong, Defendants have thus far refused to produce to Move the forensic images they made of Mr. Kaminsky's CoStar-issued computing devices, which Mr. Kaminsky would have been using during the time he was unlawfully accessing Move's confidential and trade-secret information.

## FIRST CLAIM FOR RELIEF

### (Trade Secret Misappropriation Under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*)

### (All Plaintiffs against all Defendants)

66.    Move repeats and realleges each and every allegation contained in Paragraphs 1 through 65 as if fully set forth herein.

67.    Move owns and possesses certain confidential and proprietary information properly defined as a "trade secret" pursuant to 18 U.S.C. § 1839(3). Specifically, as described above, Move is the owner of trade secrets, including (a) site traffic and unique user data and metrics related to content on Realtor.com; (b) strategy showing how those metrics will influence the future direction and content of the site; (c) strategies and tactics concerning the mix of content on Realtor.com, including page views and real-time updated information about the

26

topics and content of stories that will appear on Realtor.com before they are published; (d) search engine optimization strategies and tactics; (e) financial data and analyses and syndication of Realtor.com content through distribution channels; (f) strategies and tactics for managing the structure and operations of, and successfully running, the News & Insights and Communications teams in support of Move's Realtor.com business; (g) strategies and tactics for using content on Realtor.com to amplify Move's brand among consumers and real estate professionals; (h) information concerning conversion of Realtor.com website visitors into monetizable leads for real estate professionals; (i) plans and strategies for working with other news and media organizations to grow traffic and unique users for Realtor.com; (j) plans and concepts for future article content subject matter on Realtor.com; (k) competitive research and intelligence concerning social media exposure for online residential real estate portals; (l) compilations of public relations and/or news reporter identities, contact information, and relationship data concerning particular reporters such as content interests and ongoing projects; and (m) lists of employees, their roles and responsibilities within the organization, and employee compensation information.

68.    Move's trade secrets derive independent economic value from being not generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure or use of the information.

69.    Move has made strong efforts to preserve the confidentiality of its trade secrets through the measures set forth above, including but not limited to (a) requiring employees to sign confidentiality agreements in connection with their employment and acknowledge employment policies containing confidentiality provisions; (b) requiring departing employees to confirm confidentiality protections; requiring vendors to sign confidentiality agreements; (c) implementing physical security on office locations, including physical barriers, keycard access, and locks

on doors; (d) password requirements for local and computer network access; (e) multifactor authentication for access to the Move network; (f) use of security software and firewalls; (g) encryption of employee laptops; and (h) training for employees that includes security and confidentiality aspects.

70.    As described above, and under the doctrine of respondeat superior, Defendants without permission, accessed, acquired, disclosed, and/or misappropriated certain of Move's trade secrets through the exfiltration of confidential and proprietary documents and surreptitious continuing access to Move's real-time electronic documents after the end of Mr. Kaminsky's employment with Move, including while Mr. Kaminsky was employed by CoStar. Mr. Kaminsky knew before he was employed by CoStar and while he was employed by CoStar that the trade secrets were accessible and could be acquired through improper means because he had established surreptitious, continuing access to protected computer systems that contained those trade secrets. Mr. Kaminsky's accessing and misappropriating Move's trade secrets was within the scope of his employment as a CoStar content editor and benefited CoStar. It was foreseeable from his duties at CoStar and an outgrowth of his employment at CoStar. Accessing and misappropriating these trade secrets relating to the creation of content for an online residential real estate listings business was relevant to his employment with CoStar and is typical to CoStar's efforts to create content for its on-line residential real estate listings business.

71.    At all relevant times, Defendants knew or had reason to know that their knowledge of, access to, use of, and disclosure of Move's trade secrets was without permission.

72.    On information and belief, if Defendants are not enjoined, they will continue to misappropriate Move's confidential and trade-secret information for their own benefit and to Move's detriment.

73.     Defendants' misappropriation of Move's confidential and trade secret information has caused and threatens to cause substantial injury to Move, including, but not limited to actual damages, lost profits, harm to Move's reputation, and the diminution of the value of its trade secrets. In addition, Defendants have been and will be unjustly enriched by their misappropriation of Move's confidential and trade secret information.

74.     Move therefore seeks injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A) to protect the secrecy of its confidential and trade secret documents and information and to remedy injury to Move's business interests. Move will suffer irreparable harm absent the requested injunctive relief.

75.     Move also seeks an award of actual damages in an amount to be proven at trial under 18 U.S.C. § 1836(b)(3)(B).

76.     Further, as Defendants have misappropriated Move's confidential information and trade secrets for an improper purpose and in a willful and malicious manner, Move seeks exemplary damages for the maximum amount allowed under 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

## SECOND CLAIM FOR RELIEF

**(Trade Secret Misappropriation Under California's Uniform Trade Secrets Act, Cal. Civ. Code § 3426, *et seq.*)**

**(All Plaintiffs against all Defendants)**

77.     Move repeats and realleges each and every allegation contained in Paragraphs 1 through 76 as if fully set forth herein.

78.     For the same reasons set forth above in relation to the First Claim for Relief, Paragraphs 66 through 76, Move's trade secrets are protectable under California state law pursuant to California Civil Code Section 3426.1(d), Move used reasonable efforts to protect its trade secrets, and Defendants misappropriated the trade secrets.

79.    Defendants' misappropriation of Move's trade secrets has directly and proximately caused damage to Move including, but not limited to actual damages and the diminution of the value of its trade secrets. Defendants will be unjustly enriched by their misappropriation of Move's confidential information and trade secrets.

80.    Defendants' misappropriation of Move's trade secrets was willful and malicious.

81.    Move has no adequate remedy at law, and Defendants' actions will continue to cause Move irreparable injury unless enjoined.

82.    Move is accordingly entitled to injunctive relief against Defendants to prevent further damage and harm to Move. *See id.* at § 3426.2.  Move is also entitled to damages, including exemplary damages, and attorneys' fees, in amounts to be proven at trial. *See id.* at § 3426.3.

## THIRD CLAIM FOR RELIEF

**(Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(a)(2)(C), (a)(4), (a)(5)(B), (a)(5)(C))**

**(All Plaintiffs against all Defendants)**

83.    Move repeats and realleges each and every allegation contained in Paragraphs 1 through 82 as if fully set forth herein.

84.    During Mr. Kaminsky's last days of employment with Move, he used his authorized Move email account to grant access to Move's electronically stored documents for his unauthorized personal Gmail account.

85.    In so doing, Mr. Kaminsky created an unauthorized and ongoing electronic connection to Move's living, electronic documents, which was not known to Move and which Mr. Kaminsky knew or had reason to know was not approved by Move. Indeed, Mr. Kaminsky warranted he was not retaining access to any tangible or intangible property upon his departure from the company.

86.    After he was no longer employed by Move, Mr. Kaminsky apparently tried to cover his tracks by knowingly and intentionally accessing a Move laptop computer without authorization and deleting nearly a thousand electronic files and the entire browser history from that protected computer.

87.    After surreptitiously creating an ongoing, live connection to Move's electronic documents and emailing other documents to his personal email address, and after no longer being a Move employee, Mr. Kaminsky intentionally accessed without authorization, and viewed and obtained information from, Move's protected electronic documents, stored on its password-protected cloud-based platform, dozens of times from outside of the company.

88.    While working for CoStar in a role managing a team of other CoStar employees, Mr. Kaminsky continued to access and view Move's electronic documents relating to topics within the scope of Mr. Kaminsky's employment with CoStar. CoStar therefore vicariously accessed Move's electronic documents without authorization through its employee in a management role, Mr. Kaminsky, and is liable under a theory of respondeat superior.

89.    The computers and computer systems Mr. Kaminsky accessed without authorization were used to conduct Move's business and therefore were used in and affected interstate and foreign commerce and communications.

90.    Mr. Kaminsky accessed Move's computers with intent to defraud—namely, with the intent to deceive Move and cheat it by stealing its confidential and proprietary information and documents.

91.    By repeatedly accessing Move's protected computers and viewing Move's confidential and proprietary information and documents, Mr. Kaminsky furthered his intended fraud and obtained valuable information.

92.    Mr. Kaminsky's deletion of electronic files from Move's laptop computer, and his and CoStar's repeated unauthorized and continuing access to Move's electronic documents, stored on a protected computer system, has caused

31

substantial damage and loss to Move in amounts to be proven at trial but far exceeding $5,000 in a one-year period. As discussed above, Move has, for example, expended significant resources to investigate the scope of Mr. Kaminsky's intrusions, secure Move's computer networks following Mr. Kaminsky's breach, and assess potential damage he may have caused. Mr. Kaminsky's conduct also impaired the integrity and availability of data and information.

## FOURTH CLAIM FOR RELIEF

**(Violation of the Comprehensive Computer Data Access and Fraud Act,**

**California Penal Code §§ 502(c)(1)-(3), (7))**

**(All Plaintiffs against all Defendants)**

93.    Move repeats and realleges each and every allegation contained in Paragraphs 1 through 92 as if fully set forth herein.

94.    For all of the same reasons set forth above in relation to the Third Claim for Relief, Paragraphs 83 through 92, Mr. Kaminsky violated California's Comprehensive Computer Data Access and Fraud Act by granting himself ongoing access to Move's electronic documents stored on protected computers and accessing those protected computers, computer systems, and computer networks without authorization.

95.    Mr. Kaminsky's access to Move's living, electronic documents after he stopped working for Move and began working for Move's competitor CoStar was knowing and without permission or authorization. Mr. Kaminsky was not authorized to access Move's computers or computer network, Move's electronic files, or Move's information after he departed the company. Mr. Kaminsky was aware that he was not authorized to access Move's computers, network, or documents. Indeed, Mr. Kaminsky warranted he would not do so.

96.    While working for CoStar in a role managing a team of other CoStar employees, Mr. Kaminsky continued to access Move's electronic documents relating to topics within the scope of Mr. Kaminsky's employment with CoStar.

CoStar therefore vicariously accessed Move's electronic documents without authorization through its employee in a management role, Mr. Kaminsky, and is liable under a theory of respondeat superior.

97.    Through this unauthorized infiltration of Move's protected computer system, Defendants improperly accessed, used, and took data from a protected computer system, harming Move. Mr. Kaminsky also knowingly and without permission deleted nearly a thousand electronic files from a Move laptop computer, including a large number of what appear to be business files, and deleted all of the web browser history from Move's computer after his employment with Move ended. This conduct was committed to execute Mr. Kaminsky's scheme to defraud Move by stealing its confidential and proprietary information and to wrongfully obtain Move's property and data.

98.    Defendants' conduct, including Mr. Kaminsky's deletion of electronic files, and Mr. Kaminsky's and CoStar's repeated access to Move's electronic documents stored on a protected computer network, has substantially damaged Move.

99.    Move is accordingly entitled to injunctive relief against Defendants to prevent further damage and harm to Move. *See id.* at § 502(e)(1). Move is also entitled to damages, including exemplary damages and attorneys' fees, in amounts to be proven at trial. *See id.* at § 502(e)(1), (2), (4).

## FIFTH CLAIM FOR RELIEF

### (Breach of Contract)

### (Plaintiffs Move, Inc., and Move Sales, Inc., against Defendant James Kaminsky)

100.    Move repeats and realleges each and every allegation contained in Paragraphs 1 through 99 as if fully set forth herein.

101.    Move, Inc., Move Sales, Inc., and Mr. Kaminsky are parties to the Confidentiality Agreement and the Separation Agreement.

102.    Move, Inc., Move Sales, Inc., have substantially performed all their obligations under the Agreements, including but not limited to providing Mr. Kaminsky with the stated severance payment, and other benefits. If Move, Inc., or Move Sales, Inc. has not performed any obligation, it was excused from performance.

103.    Mr. Kaminsky promised in the Confidentiality Agreement to hold Move's confidential, proprietary, and trade secret information in "strict confidence and trust," and not to "use or disclose it" "without the prior written consent" of Move. He further agreed that upon termination of his employment with Move, he would "not take with [him] any documents or materials or copies thereof" containing Move's confidential or trade secret information. By exfiltrating Move's confidential, proprietary, and trade secret information upon the termination of his employment with Move, and by continuing to access Move's documents containing confidential, proprietary, and trade secret information after he stopped working for Move and began working for Move's competitor, Mr. Kaminsky breached each of those promises.

104.    Also in the Confidentiality Agreement, Mr. Kaminsky agreed that he would notify Move of any employment he accepted for one year following the termination of his employment with Move. The Confidentiality Agreement specified that the notice was to be provided "in writing by U.S. Mail, return receipt requested, within ten (10) calendar days of accepting employment with any other employer[.]" The notice was required to "include the name, address, and telephone number of the new employer(s), the date employment begins, and the duties to be performed[.]" Mr. Kaminsky did not comply with this notification requirement after he accepted an offer of employment with CoStar, thereby breaching this additional provision of the Confidentiality Agreement.  On information and belief, Mr. Kaminsky withheld this information from Move to avoid detection of the misconduct set forth in this Complaint.

105.    In the Separation Agreement, Mr. Kaminsky "represent[ed] and warrant[ed]" he had returned to Move or would return to Move as soon as reasonably practicable, "all tangible or intangible property or data" belonging to Move, "of any type whatsoever that has been in your possession or control." Mr. Kaminsky also agreed that he would "continue to be bound by the terms of the Confidentiality Agreement" and that he would hold all confidential and trade secret information "in the strictest confidence," and would not make use of such information "on behalf of anyone." He further confirmed that he had "delivered to [Move] all documents and data of any nature" containing or pertaining to confidential or trade secret information, and that he had "not retained any such documents or data or any reproduction thereof." By exfiltrating Move's confidential, proprietary, and trade secret information upon the termination of his employment with Move, and by continuing to access Move's live documents containing confidential, proprietary, and trade secret information after he stopped working for Move and began working for Move's competitor, Mr. Kaminsky breached his warranty and each of those promises to Move. Moreover, by deleting nearly 1,000 files from his company-issued laptop and deleting all browsing history before returning the laptop to Move, Mr. Kaminsky breached his promise in the Separation Agreement to return to Move "all tangible or intangible property or data" belonging to Move "of any type whatsoever," electing to destroy electronic data belonging to Move rather than return it to Move as he had promised he would do.

106.    Mr. Kaminsky's breaches of contract have substantially damaged Move, Inc., and Move Sales, Inc., including but not limited to actual damages, lost profits, harm to Move's reputation, and the diminution of the value of its trade secrets. Mr. Kaminsky's breaches have caused and will cause irreparable injury to Move, Inc., and Move Sales, Inc.

# SIXTH CLAIM FOR RELIEF

## (Promissory Fraud)

## (Plaintiffs Move, Inc., and Move Sales, Inc. against Defendant James Kaminsky)

107.  Move repeats and realleges each and every allegation contained in Paragraphs 1 through 106 as if fully set forth herein.

108.  Mr. Kaminsky was notified on January 10, 2024, that his employment with Move would end effective January 19, 2024. He was also offered a generous severance package. Mr. Kaminsky immediately put into effect a plan to take electronic documents from Move.

109.  On January 11 and 12, 2024, Mr. Kaminsky sent internal Move documents from his Move computer, using his Move email address, to his personal email address. He also granted his personal email account access to Move's internal cloud-based documents so he could access them after departing Move.

110.  On January 25, 2024, Mr. Kaminsky "represent[ed] and warrant[ed]" that he had returned to Move, or would return to Move as soon as reasonably practicable, "all tangible or intangible property or data" belonging to Move, "of any type whatsoever that has been in [his] possession or control."

111.  At the time he made these written promises, Mr. Kaminsky knew his promises and warranties were false. He was not performing them and would not be performing them. Mr. Kaminsky signed the Separation Agreement on January 25, 2024, but he had already begun taking documents from Move. He had also already begun accessing Move's documents without authorization between his last working day on January 12, 2024, and the day he signed the Separation Agreement on January 25, 2024. He had already destroyed electronic files belonging to Move that he was promising he would return to Move. Mr. Kaminsky made these false promises intending for Move, Inc., and Move Sales, Inc. to rely on them, in order to collect

the severance payment and other benefits Move had offered him as part of his severance arrangement.

112.  Relying on those representations, warranties, and promises, which Mr. Kaminsky knew were false at the time he made them, Move paid Mr. Kaminsky a severance payment and provided other benefits to Mr. Kaminsky. The Separation Agreement expressly conditioned that payment upon Mr. Kaminsky's return of all tangible or intangible property or data belonging to Move.

113.  Mr. Kaminsky's fraudulent misrepresentations damaged Move, Inc., and Move Sales, Inc., including but not limited to the amount of Mr. Kaminsky's severance payment and other benefits provided by Move. Mr. Kaminsky's false promises were made with the intent to deceive Move, Inc., and Move Sales, Inc. He acted with malice, oppression, and fraud.

## **PRAYER FOR RELIEF**

WHEREFORE, Move prays for judgment as follows:

A.  For an Order permanently enjoining CoStar Group, Inc., and James Kaminsky from further using or disclosing Move's trade secrets and confidential information and to return all of the same to Move;

B.  For preliminary injunctive relief against CoStar and Mr. Kaminsky;

C.  For compensatory damages according to proof;

D.  For exemplary and punitive damages according to proof and as allowed by law;

E.  For an order disgorging Defendants of amounts by which they were unjustly enriched and by which they profited from their unlawful conduct;

F.  For statutory damages as allowed by law;

G.  For pre- and post-judgment interest;

H.  For Move's reasonable attorneys' fees as a prevailing party pursuant to 18 U.S.C. § 1836(b)(3)(D) as well as other applicable state and federal

law, and the applicable contracts;

I.    For costs and other expenses; and

J.    For such other further relief as the Court deems just and proper.

Dated:  November 19, 2024          JENNER & BLOCK LLP

                          By:

                              Todd C. Toral

                              *Attorneys for Plaintiffs*

SECOND AMENDED COMPLAINT

1

## **JURY DEMAND**

2

Plaintiffs hereby demand a trial by jury on all issues so triable.

3

4

Dated:  November 19, 2024          JENNER & BLOCK LLP

5

6

By:

7

Todd C. Toral

8

*Attorneys for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28